Todd O. Maiden (SBN 123524)
Email:  tmaiden@reedsmith.com
Phillip H. Babich (SBN 269577)
Email:  pbabich@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA  94105
Telephone:     +1 415 543 8700
Facsimile:     +1 415 391 8269

Attorneys for Defendant,
Counterclaimant, and Crossclaimant
BANK OF AMERICA, N.A.

<div style="text-align:center">

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

</div>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RICHARD G. WHITEHURST and LORRAINE D. WHITEHURST, as individuals and as trustees of the Whitehurst Family Trust,<br><br>Plaintiffs,<br><br>vs.<br><br>BANK OF AMERICA, NATIONAL ASSOCIATION, a national banking corporation; CHARLOTTE A. HEINL, as an individual dba Norge Cleaners; and DOES 1 through 100,<br><br>Defendants. | No.: C 09-04808 MEJ<br><br>**STIPULATION OF DISMISSAL WITH PREJUDICE AND [PROPOSED] ORDER OF DISMISSAL**<br><br>**FRCP 41(a)(2)**<br><br>Compl. Filed:     October 8, 2009<br>FAC Filed:        December 11, 2009 |
| BANK OF AMERICA, NATIONAL ASSOCIATION, a national banking corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>RICHARD G. WHITEHURST and LORRAINE D. WHITEHURST, as individuals and as trustees of the Whitehurst Family Trust; and ROES 1 through 100,<br><br>Counterdefendants. | |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

| | |
|---|---|
| BANK OF AMERICA, NATIONAL ASSOCIATION, a national banking corporation, | |
| Crossclaimant, | |
| vs. | |
| CHARLOTTE A. HEINL; and ZOES 1 through 100, | |
| Crossdefendants. | |

Richard G. Whitehurst and Lorraine D. Whitehurst, as individuals and as trustees of the Whitehurst Family Trust (collectively "Whitehurst"); defendant Bank of America, National Association, a national banking association (the "Bank"); and Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners by and through her insurance company the Chicago Insurance Company, one of the Fireman's Fund Insurance Companies, ("Fireman's Fund" or "Heinl" and together with Whitehurst and the Bank as "Parties") have settled this action.  (*See* Order Granting Motion for Determination of Good Faith Settlement (April 14, 2015) [Dkt. No. 54].)  A true and correct copy of the Settlement Agreement and the First Amendment to the Settlement Agreement (together the "Settlement Agreement"), which the parties agree are both enforceable, are attached to this stipulation as Exhibits A and B, respectively.

The Parties **HEREBY STIPULATE** through their designated counsel that the entire above-captioned action be and hereby is dismissed with prejudice pursuant to FRCP 41(a)(2) and the Settlement Agreement.  The Parties request that the Court retain jurisdiction to enforce the terms and conditions of the Settlement Agreement and, therefore, respectfully request that the Court incorporate the Settlement Agreement in its Order of Dismissal.  "Parties who wish to retain the court's jurisdiction to enforce their settlement agreement may do so . . . *by incorporating the terms of the settlement agreement in the order of dismissal.*  In [that] event, breach of the settlement agreement violates the court's order, thereby creating *ancillary jurisdiction* to enforce the agreement."  *See* Cal. Prac. Guide: Fed. Civ. Pro. Before Trial, Ch. 15-C, § 15:141.1 (The Rutter Group 2011) (emphasis in original) (*citing Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S.

1  375, 381 (1994), *Hagestad v. Tragesser,* 49 F.3d 1430, 1432 (9th Cir. 1995), *and Hill v. Baxter*

2  *Healthcare Corp.,* 405 F.3d 572, 576-577 (7th Cir. 2005)).  "[T]he court clearly has ancillary

3  jurisdiction to enforce its own orders and decrees. . . .  Therefore, to the extent the settlement is

4  embodied in the judgment, the court can enforce it by execution and by contempt proceedings in

5  appropriate cases." *Id.,* § 15:141.18 (*citing TNT Marketing, Inc. v. Agresti,* 796 F.2d 276, 278 (9th

6  Cir. 1986)).

7        By signing below, counsel certify that they have the authority to bind, and are binding, the

8  party or parties that they are signing on behalf of.

10  **Paladin Law Group® LLP**                    **Reed Smith LLP**

11  By:  /s/ John R. Till                         By:  /s/ Todd O. Maiden
    John R. Till                                  Todd O. Maiden
12  Attorney for Whitehurst                       Attorney for Bank of America, NA
    Date:  April 24, 2015                         Date:  April  24, 2015

15  **Wood, Smith, Henning & Berman LLP**

16  By:  /s/ David F. Wood
    David F. Wood
17  Attorney for Heinl
    Date:  April 24, 2015

18                        **[PROPOSED] ORDER OF DISMISSAL**

20  The Court orders that this action shall be and hereby is dismissed with prejudice and with mutual

21  waivers of costs pursuant to Federal Rule of Civil Procedure 41(a)(2) and the Court retains

22  jurisdiction to enforce the parties' Settlement Agreement, *see* Exhibits A and B, which the Court

23  incorporates herein.

24  **IT IS SO ORDERED**.

25   Dated: April 24, 2015

27  _____
    Maria-Elena James
    United States Magistrate Judge

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Exhibit A

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

## SETTLEMENT AGREEMENT AND RELEASE

     This Settlement Agreement and Release (hereinafter referred to as the "Agreement"), as of the Effective Date, is entered into by and between: (a) Richard G. Whitehurst and Lorraine D. Whitehurst, as individuals and as trustees of the Whitehurst Family Trust (collectively hereinafter "Whitehurst"); (b) Chicago Insurance Company, one of the Fireman's Fund Insurance Companies, on behalf of its insured, Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners (collectively hereinafter "Fireman's Fund"); and (c) Bank of America, N.A. (hereinafter the "Bank"). Whitehurst, Charlotte Heinl ("Heinl"), deceased, and the Bank shall collectively be referred to as "the Parties" and each of them a "Party" to this Agreement.

## RECITALS

**WHEREAS:**

A.    Whitehurst currently owns in fee simple certain real property and improvements located at 2114 MacArthur Boulevard, Oakland, California --- and previously known as 2114-2116 MacArthur Boulevard, Oakland, California, and with prior APN numbers of 29A-1302-23-4, 29A-1302-24, and 29A-1302-25 and current APN of 29A-1302-051 (the "Property") --- (collectively, the "Whitehurst Property");

B.    Bank of America, N.T. & S.A. owned the Whitehurst Property from approximately 1969 to 1987;

C.    Heinl owned and operated a dry cleaning business at the Whitehurst Property from approximately 1966 to 1987;

D.    Whitehurst purchased the Whitehurst Property from Bank of America, N.T. & S.A. in 1987;

E.    The Bank is a successor in interest of Bank of America, N.T. & S.A.;

F.    The Bank currently owns in fee simple certain real property and improvements located at 2154 MacArthur Boulevard, Oakland, California (the "Bank Property");

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

G.      On October 8, 2009, Whitehurst filed an action in order to adjudicate the liability associated with responding to the presence of Hazardous Substances at the Site.  Whitehurst filed the action in the United States District Court for the Northern District of California, entitled *Whitehurst v. Bank of America, et al.*, Case No. 09-CV 04808 MEJ.  On December 11, 2009, Whitehurst filed a First Amended Complaint.  In that action, Whitehurst alleges that the Bank and Heinl were responsible for Environmental Contamination (defined below) at the Site, as well as numerous other damages associated with the attempted leasing and sale of the Site;

H.      On January 4, 2010, the Bank filed a counterclaim against Whitehurst, alleging that Whitehurst is responsible for costs associated with the investigation and remediation of Hazardous Substances (defined below) at the Site;

I.      On March 3, 2010, the Bank filed a cross-claim against Heinl, alleging Heinl was responsible for costs associated with the investigation and remediation of Hazardous Substances at the Site as a former tenant who owned and operated a dry cleaning facility at the Site.  Heinl, prior to her death, represented and warranted that outside of insurance proceeds, she was unable to make any payments for investigation and remediation of Hazardous Substances at the Site.

J.      The Parties dispute the events, facts, and dates when releases of Hazardous Substances at the Site actually or allegedly caused or contributed to the alleged Environmental Contamination at the Site;

K.      While the Parties deny any responsibility for Environmental Contamination at the Site, each Party desires and intends to effect a final settlement of all claims and disputes between them through this Agreement; and,

L.      Whitehurst and the Bank intend to remediate the Site through a fixed cost remediation agreement (an exemplar of which is attached to this Agreement as **Exhibit 1**) with a reputable environmental consulting firm for $2,050,000.00.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

## TERMS

NOW, THEREFORE, in consideration of the terms, conditions, and promises set forth herein, the Parties agree as follows:

1.      Definitions.

Words used in this Agreement are to be taken and understood in their normal and ordinary sense unless this Agreement indicates that a different meaning is intended. Whenever the following terms are used in this Agreement, the meanings of this section apply:

A.      "Action" means the lawsuit in the United States District Court for the Northern District of California, entitled *Richard Whitehurst, et al. v. Bank of America, et al.*, Case No. 09-CV 04808 MEJ, including all counterclaims, cross claims, and any Claims or causes of action which were brought or could have been brought by or between the Parties to this Agreement.

B.      The "Bank" means and refers to Bank of America, N.A., defendant in the Action, and each of its principals, agents, representatives, contractors, subcontractors, joint venturers, attorneys, insurers, employees, subsidiaries, parents, affiliates, shareholders, members, directors, officers, predecessors, successors, and assigns.

C.      "Claims" means any cause of action, including but not limited to any and all claims, legal theories, counterclaims, cross-claims, actions, demands, rights, liabilities, affirmative defenses and/or obligations of every kind and nature, including actual or alleged personal injury, bodily injury, property damage, and/or notices of partial or total responsibility (including potential responsible party or "PRP" notices) by any person, entity of any kind, or by any Regulatory Agency, whether known or unknown, past, present, or future, suspected or unsuspected, liquidated or unliquidated for:

i.      any past, present, or future fees, attorneys' fees, costs, expenses, and liabilities incurred or which may be incurred for testing, investigating, remediating, removing, neutralizing, detoxifying, monitoring, containing, cleaning up, treating, mitigating, or in any way responding to Environmental Contamination;

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

        ii.     any past, present or future Regulatory Agency, or other governmental or quasi-governmental agencies' requests, demands, directives, claims, suits, or orders relating to the investigation or remediation of Environmental Contamination;

        iii.    lost profits, lost rental income, diminution in property value; and/or

        iv.    bad faith or extra contractual damages.

    D.    "Consultant" refers to and means the environmental engineering or consulting firm that will ultimately perform the Remediation Project at the Site.

    E.    "Court" means the United States District Court for the Northern District of California.

    F.    "Effective Date" means the date upon which this Agreement has been executed by all Parties.

    G.    "Environmental Contamination" means Hazardous Substances, including without limitations, those substances commonly associated with dry cleaning operations (specifically, perchloroethylene, aka "PCE" or "perc," and its degradation products) in, at, under, in the vicinity of, or emanating from the Whitehurst Property or stemming, directly or indirectly, from the dry cleaning business or any other business associated with the Whitehurst Property, or alleged activities by Whitehurst or Heinl at or in the vicinity of the Whitehurst Property, which are required by a Regulatory Agency to be investigated, remediated, addressed, responded to, mitigated, monitored, or which are otherwise causing and/or threatening to cause damage to human health and/or environment, any surface water, ground water, water, drinking water supply, soil, air, land surface, or subsurface strata.

    H.    "Hazardous Substances" means any hazardous waste, solid waste, hazardous material, or hazardous substance as defined in any federal, state or local statute, ordinance, rule, or regulation including without limitation:

        i.     the substances included within the definition of the term "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601(14), and regulations promulgated thereunder, as amended;

ii.    the substances included within the definition of the term "hazardous substances" under the California Hazardous Substance Account Act, California Health and Safety Code § 25300 *et seq.*, and regulations promulgated thereunder, as amended;

iii.    any "pollutant or contaminant" under section 101(33) of CERCLA, 42 U.S.C. § 9601(33);

iv.    any "solid waste" under section 1004(27) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903(27); and

v.    any "hazardous waste" or "extremely hazardous waste" under 22 California Code of Regulations section 66600 *et seq.*

I.    "Heinl" refers to and means Charlotte A. Heinl, deceased,  defendant in the Action and former owner and operator of Norge Cleaners located at 2114 MacArthur Blvd., Oakland, California, and each of her respective trusts, estates, heirs, beneficiaries, principals, agents, representatives, contractors, subcontractors, joint venturers, attorneys, insurers, employees, subsidiaries, parents, affiliates, shareholders, members, directors, officers, predecessors, successors, and assigns.

J.    "No Further Action" (or "NFA") means that the Regulatory Agency which is acting as the government agency with primary jurisdiction over the investigation and remediation of Environmental Contamination at the Site has determined and has provided a written statement or statements that: (i) the subsurface soils of the Whitehurst Property have been remediated to a level that will allow commercial / industrial uses on ground level of the Whitehurst Property, in compliance with applicable Hazardous Substances laws and regulations; and (ii) no further or additional investigation, remediation, mitigation, or other action is required to address the Environmental Contamination at the Site for commercial / industrial uses on the ground floor.  It is noted that none of the Settling Parties will oppose a No Further Action determination which would allow the Whitehurst Property to be redeveloped with a mixed use development of commercial on the ground floor and residential on the floors above.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

K.      "Project Manager" has the meaning as set forth below in Section 4.A of the Agreement.

L.      "Regulatory Agency" means any federal, state, regional, county or local governmental body, agency, or department with jurisdiction over issues relating to Hazardous Substances at the Site, including but not limited to the California Regional Water Quality Control Board, San Francisco Bay Region.

M.      "Remediation Project" refers to and means the remediation of Environmental Contamination at the Site which is to be performed by a qualified Consultant according to costs and specifications as set forth in a "Fixed Price Remediation Agreement," an exemplar of which is attached to this Settlement Agreement as **Exhibit 1**.

N.      "Remediation Escrow Account" has the meaning as set forth below in Section 4.C of this Agreement.

O.      "Site" refers to and means any real property, building, facility, or the environment, including but not limited to soil, groundwater, vapor, air, and any other location at which Hazardous Substances or Environmental Contamination actually or allegedly have, may come to be located, or may threaten to become located at, under, on, within, and/or emanating, directly or indirectly, from: (1) the Whitehurst Property; (2) the dry cleaning business and any other business which was located at the Whitehurst Property (before or after Whitehurst purchased the Property); (3) alleged activities by Whitehurst or Heinl at the Whitehurst Property; and/or (4) as otherwise defined in the Fixed Price Remediation Agreement.

P.      "Whitehurst" refers to and means Richard Whitehurst, individually and as trustee, Lorraine D. Whitehurst, individually and as trustee, the Whitehurst Family Trust, and their respective trusts, estates, heirs, beneficiaries, principals, agents, representatives, contractors, subcontractors, joint venturers, attorneys, insurers, employees, subsidiaries, parents, affiliates, shareholders, members, directors, officers, predecessors, successors, and assigns.

Q.      "Whitehurst Remediation Cost Advancement" refers to and means that certain amount of money discussed below in Section 3.C of the Agreement that the Bank will pay

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

toward the Remediation Project on behalf of Whitehurst and which Whitehurst will reimburse the Bank as set forth below.

2.     Site Remediation.     Whitehurst and the Bank agree to remediate Environmental Contamination to the satisfaction of a Regulatory Agency, for purposes of obtaining a No Further Action ("NFA") Letter from the Regulatory Agency, relating to the dry cleaning chemicals referenced above in Sections 1.G. and 1.H.  Whitehurst and the Bank acknowledge that a Regulatory Agency may issue more than one NFA letter for the Site.  By way of example, Contractor will seek an initial NFA from the Agency for the soils and vapor at, on, and under the Property so as to allow redevelopment of the real property currently owned by Whitehurst ("Initial NFA") and at a later time seek the issuance of a second NFA for the balance of remedial issues, such as soil, groundwater, and/or vapor intrusion risks off the Property.  The final NFA shall be considered issued when the Regulatory Agency confirms in writing that no further or additional investigation, remediation, mitigation, monitoring, or other action is required to address the Environmental Contamination at the Site ("Final NFA").  Fireman's Fund shall have no duties or responsibilities with respect to the planned Site Remediation.

3.     Settlement Fund.

       A.     Within five (5) business days after the Effective Date of this Agreement, the Bank shall provide the other Parties with wiring instructions for deposits into the Remediation Escrow Account.     Within ten (10) business days after the Effective Date of this Agreement, the following payments shall be made to the Remediation Escrow Account in the amounts set forth below:

               i.      Whitehurst:  Two Hundred Thousand Dollars ($200,000);

               ii.     Fireman's Fund (on behalf of Charlotte Heinl, deceased):  Six Hundred Thousand Dollars ($600,000); and

               iii.    Bank:  One Million Four Hundred Thousand Dollars ($1,400,000), which includes the Whitehurst Remediation Cost Advancement of Two Hundred Thousand Dollars ($200,000) discussed below in Section 3.C.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

B.      Funds from the Remediation Escrow Account will be paid to the Consultant for the Remediation Project pursuant to the terms and conditions set forth below in Section 4.D of the Agreement regarding the Remediation Trust Account.

C.      <u>Whitehurst Remediation Cost Advancement</u>:

i.      Two Hundred Thousand Dollars ($200,000) of the Bank's One Million Four Hundred Thousand Dollars ($1,400,000) contribution to the Remediation Project is an interest free advancement of funds from the Bank to Whitehurst, which will be paid directly to the Remediation Escrow Account (the "Whitehurst Remediation Cost Advancement").

ii.     Whitehurst will reimburse the Bank Two Hundred Thousand Dollars ($200,000) within one hundred eighty (180) calendar days, after the issuance of the Initial NFA letter from a Regulatory Agency relating to Hazardous Substances at the Site remediated to commercial/industrial standards, as discussed in detail below in Section 4.

4.      <u>Environmental Remediation of the Site</u>.

A.      <u>Project Manager</u>.

i.      <u>Designation</u>. Within ten (10) business days of the Effective Date of this Agreement, the Bank shall designate a Project Manager, who is a professional environmental consultant with professional skills and experience necessary to provide oversight for the Remediation Project. The Project Manager may be a Bank employee. The Bank will make this designation by providing Notice to Whitehurst pursuant to Section 11.W of this Agreement. The Bank shall exercise good faith discretion in designating a Project Manager who can effectuate the terms and conditions of the Settlement Agreement and the Fixed Price Remediation Agreement. Whitehurst shall have seven (7) business days to object to the Bank's designee, but shall not unreasonably object to the Bank's designee. Fireman's Fund on behalf of Heinl agrees to abide by the selection of a Project Manager pursuant to this paragraph without objection.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

ii.    Duties.  The Project Manager shall:

(1)    supervise and direct the implementation of the Remediation Project under this Agreement and undertake commercially reasonable efforts to ensure expeditious completion of the Remediation Project and receipt of a Final NFA determination by the Regulatory Agency which is acting as the governmental agency with primary jurisdiction over the investigation and remediation of Environmental Contamination;

(2)    manage the Consultant to implement the Remediation Project and oversee the Consultant's coordination of cleanup activities with applicable Regulatory Agencies;

(3)    maintain commercially reasonable communication with all Parties as to the progress of the Remediation Project and expenses incurred; and

(4)    approve payments for invoices submitted by the Consultant pursuant to the terms and procedures set forth below under Section 4.D from the Remediation Escrow Account.

iii.    Authorization.  The Project Manager shall have authorization to execute requests for Regulatory Agency authorizations, including but not limited to work plans and permits on behalf of the Parties as is necessary for work on the Remediation Project.

iv.    Release of Liability.  No Claims of any kind at any time shall be made against the Bank or the Project Manager by Whitehurst as a result of any activities of the Project Manager, except for instances of negligence resulting in a material adverse effect upon the Remediation Project, gross negligence, or intentional misconduct.

B.    Replacement of Project Manager.  In the event the Bank chooses to replace its designated Project Manager, the Bank shall designate another individual with similar credentials and experience.  The replacement Project Manager may be a Bank employee.  The Bank shall provide Notice to Whitehurst pursuant to Section 11.W of this Agreement.  The Bank shall exercise its discretion in designating a replacement Project Manager in good faith to effectuate the terms and conditions of the Settlement Agreement and the Fixed Price Remediation

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

Agreement.  Whitehurst shall have seven (7) business days to object to the Bank's designee, but shall not unreasonably object to the Bank's replacement designee.

      C.      Remediation Escrow Account.

      i.      Payor.  The Bank shall designate a Payor who is authorized to make payments from the Remediation Escrow Account to the Consultant for work on the Remediation Project related to the Remediation Project.  The Payor may be counsel for the Bank.  The Bank shall exercise its discretion in designating a Payor in good faith to effectuate the terms and conditions of the Settlement Agreement and the Fixed Price Remediation Agreement.

      ii.      Payor's Responsibilities.  Within three (3) business days after receiving settlement funds from the Parties, Payor shall deposit said funds into a segregated trust fund. Payor's sole duties will be to release funds to:  (a) the Consultant upon direction of the Project Manager, as further described below in Subsection D and (b) the applicable Regulatory Agency for regulatory oversight costs, as further described below in Subsection E.

      iii.      Release of Liability.  No Claims of any kind at any time shall be made against the Bank or the Payor by Whitehurst as a result of any activities of the Payor, except for instances of gross negligence or intentional misconduct.

      D.      Payments to Consultant.

      i.      Payments will be made to the Consultant according to a Schedule of Payments, an exemplar of which is attached to the Fixed Price Remediation Agreement as **Attachment C**.

      ii.      An invoice for payment ("Consultant's Invoice") will be submitted by the Consultant simultaneously to the Payor for the Remediation Trust Account and the Project Manager for the Remediation Project, according to the terms and conditions set forth in the Fixed Price Remediation Agreement.

      iii.      The Payor shall issue payment to the Consultant for the Consultant's Invoice within thirty (30) calendar days after receipt of the invoice unless the Payor receives a

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

written objection from the Project Manager within twenty one (21) calendar days after the Project Manager receives the Consultant's Invoice.

iv.     Each Party will have fourteen (14) calendar days from receipt of the Consultant's Invoice to submit such written objections to the Project Manager, who, using his or her best professional judgment, can adopt, amend, or reject such objections by providing a written response to the objecting Party explaining the Project Manager's decision and incorporating any such adoption or amendment to an objecting Party's objection into his or her written objection(s) submitted to the Payor and the Consultant.

v.     Each objection shall set forth with specificity the nature of the objection. In the event notice of objection to a Consultant's Invoice is provided, the Project Manager and the Consultant shall use their best efforts to resolve the objection to the disputed Consultant's Invoice.  Payment of each portion of the Consultant's Invoice over which there is no material dispute shall be due within thirty (30) days after the Payor's and Project Manager's receipt of the invoice.  Payment of the disputed portion of the invoice shall be due no later than thirty (30) days following resolution of the disputed Consultant's Invoice.  All objections to the Consultant's Invoice that have not been resolved within sixty (60) days following receipt of the invoice shall be subject to the dispute resolution provisions of the Fixed Price Remediation Agreement. Objections to payment of the Consultant's Invoice must be based on one or more of the following reasons:

(1)     Services are not being performed in accordance with the Fixed Price Remediation Agreement due to the fault or negligence of the Consultant (or its agents, subcontractors, or materials suppliers);

(2)     The Consultant has failed to make payments in accordance with the terms of the Consultant's contracts with its subcontractors or for labor, materials, or equipment supplied to the Site;

(3)     A claim against the Parties or the Site has been filed by a third party, based on, relating to, or arising out of the Services performed or to be performed by the Consultant;

Page 11 of 24

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

(4)     The Consultant or its agent, subcontractor, or materials supplier has caused damage to the Parties, a third party, or the Site;

(5)     The Consultant is otherwise failing to comply with a material provision of the Fixed Price Remediation Agreement or is not able to complete the work under the Fixed Price Remediation Agreement; or

(6)     The Consultant, voluntarily or involuntarily, is in bankruptcy.

vi.     If the Project Manager does not file a notice of objection with the Payor and the Consultant by the 21st day after receipt of the Consultant's Invoice, the Payor shall pay the said invoice per Section 4.D above.

E.     <u>Payment of Regulatory Oversight Costs</u>.   The Payor, as set forth above in Subsection 4.C.ii, shall use funds from the Remediation Escrow Account to pay for applicable Regulatory Agency oversight fees and costs arising from the investigation, remediation, monitoring, and mitigation measures relating to the Remediation Project, up to One Hundred Fifty Thousand Dollars ($150,000).

F.     <u>Residual Funds</u>.   If there are any residual funds ("Residual Funds") in the Remediation Escrow Account one hundred eighty (180) days after issuance of the Final NFA, seventy five percent (75%) of the Residual Funds shall be distributed to the Bank, with the remaining twenty five percent (25%) distributed:

i.     first to the Bank to the extent Whitehurst has not reimbursed the Bank Two Hundred Thousand Dollars ($200,000) pursuant to Section 3.C.ii ("Whitehurst Remediation Cost Advancement") of this Agreement, and

ii.     next to Whitehurst if any Residual Funds remain.

G.     <u>Clean-up Standard for the Site</u>.   The purpose of the Remediation Project is to obtain a No Further Action determination from the Regulatory Agency with primary jurisdiction over the Remediation Project, stating that:  (i) the subsurface soils of the Site have been remediated to a commercial/industry standard pursuant to applicable Hazardous Substances laws and regulations and (ii) no further or additional investigation, remediation, mitigation,

monitoring, or other action is required to address the Environmental Contamination as determined by the Regulatory Agency.

H.    <u>Deed Restrictions</u>.  If requested by a Regulatory Agency as a necessary condition for the issuance of a No Further Action Letter, Whitehurst shall sign a covenant and deed restriction acceptable to the Regulatory Agency that will restrict via engineered controls and use of groundwater at the Whitehurst Property.  It is not the intent of the Parties to this Agreement to restrict the future use of the Whitehurst Property to non-residential uses.  However, the Parties to this agreement recognize the deed restrictions may be required in connection with engineered controls put in place during redevelopment of the Whitehurst Property.  Attached as **Exhibit 2** is the form of the possible deed restriction which might be required at Whitehurst Property, the attachment of which adds no further duties or obligations to the Parties other than those expressed in the terms and conditions of the Settlement Agreement.

5.    <u>Agreement Contingent upon Good Faith Approval</u>.

A.    <u>Conditions Precedent</u>.  This Agreement is contingent upon entry of an order by the Court determining that the settlement embodied herein is "in good faith" within the meaning of California Code of Civil Procedure sections 877 and 877.6, Section 4 of the Uniform Contribution Among Tortfeasor Act, CERCLA, RCRA, and federal common law, and barring all contribution and indemnity claims against each Party to this Agreement, except as otherwise specified herein, for fees, costs, or damages arising from Environmental Contamination at the Site, to the extent allowed by law.  This Agreement is also contingent upon the Court retaining jurisdiction over this matter to resolve any and all disputes that arise under this Agreement between the Parties.

B.    <u>Schedule for Filing Good Faith Motion</u>.  Within ten (10) business days of the Effective Date of this Agreement, the Bank shall prepare and circulate to each of the Parties to this Agreement a draft of a joint motion for the good faith order described in Section 5.A. Whitehurst and Fireman's Fund, on behalf of its insured, Charlotte Heinl, deceased, shall provide comments with regard to the Bank's draft motion for good faith approval within seven (7) business days of receipt.  The Bank shall then file the agreed upon motion with the Court within seven (7) business days of the Parties agreeing upon a final draft of the motion.  Whitehurst and

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

Fireman's Fund, on behalf of its insured, Charlotte Heinl, deceased, shall file a joinder in such motion so long as the motion is consistent with this Agreement and the comments provided by Whitehurst related to the motion.  If the Bank fails to provide or file the document in a timely fashion, as set forth in this paragraph, then the contingency related to the good faith approval of the Agreement in Section 5.A above shall be deemed waived by the Bank.  In such event, Fireman's Fund, on behalf of its insured, Charlotte Heinl, deceased, and Whitehurst may prepare and file, jointly or separately, a motion for good faith approval of the Agreement with twenty (20) business days of the Effective Date.  If no Party to the Agreement files a good faith motion by the twentieth (20) business day following the Effective Date, as set forth in this paragraph, then the contingency related to good faith approval of the Agreement in Section 5.A above shall be deemed waived by all Parties.  In such an event, all dates within this Agreement which run from the Court Approval shall run from the Effective Date of this Agreement.  However, any such waiver of the contingency by any of the Parties to this Agreement shall not prevent any Party to the Agreement from seeking a good faith determination at a later time.

6.     Mutual Release.

       A.     In consideration of the Parties' payments as provided in Section 3.A, except as set forth below Sections 6.B and 6.C, each of the Parties, on their own behalf and on behalf of their past, present and future associates, companies, parents, parent companies, subsidiaries, predecessors, affiliates, affiliated companies, shareholders, owners, members, officers, directors, trustees, heirs, spouses, beneficiaries, partners (limited and general), managers, supervisors, employees, representatives, agents, attorneys, insurers, successors and assigns, releases each of the other Parties and their respective past, present and future associates, companies, parents, parent companies, subsidiaries, predecessors, affiliates, affiliated companies, shareholders, owners, members, officers, directors, trustees, heirs, spouses, beneficiaries, partners  (limited and  general), managers, supervisors, employees, representatives, agents, attorneys, insurers, successors and assigns from any and all claims, whether asserted or unasserted (including, without limitation, all contribution claims), losses, demands, causes of action, obligations, damages, injuries, liens, costs, expenses, penalties, fees, and liabilities, whether contractual, statutory, equitable or under  common law, whether known or unknown, whether accrued or unaccrued, and including Claims for injunctive relief as well as Claims for monetary relief of any

Page **14** of **24**

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

kind whatsoever (collectively "Released Claims") arising from or related to Environmental Contamination at and/or emanating from the Site including, without limitation, any that were or could have been alleged and/or brought in the Action, including any such claims for any fees, costs, or damages incurred in the future.

      B.     Notwithstanding the foregoing, nothing in Section 6.A or Section 7 shall release the Parties from:

            i.     their obligations under this Agreement;

            ii.     Claims brought against any Party by one or more third parties after the Effective Date of this Agreement relating to alleged Environmental Contamination at or emanating from the Site (whether such alleged presence or migration is in the past, present or future);

            iii.     Claims brought against any Party by any Regulatory Agency relating to alleged Environmental Contamination at or emanating from the Site (whether such alleged presence or migration is in the past, present or future) requiring a response or action beyond that contemplated by the Fixed Price Remediation Agreement or this Settlement Agreement;

            iv.     Claims or liens brought or alleged by third parties related to or arising from unpaid funds associated with the Remediation Project; or

            v.     Claims arising in the event that the Consultant or any successor to the Consultant is unable to perform and/or complete the Remediation Project as described and defined in the Fixed Price Remediation Agreement.

      C.     No Party will provide any insurance carrier(s) with a broader release, waiver, or buy back of any indemnity agreement than that which the Parties are providing and receiving through this Agreement.

      D.     <u>No Assignment of Claims to Other Persons</u>.  The Parties warrant and represent that they will not and have not sold, assigned, transferred, conveyed or otherwise disposed of any Claim, demand, cause of action, obligation, damage, or liability which is or could have been released or waived hereunder.  Except as provided in this Agreement and as required to enforce

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

the provisions of this Agreement, the Parties, and each of them, represents and warrants that it will not make, assert or maintain against any person, entity or Party that it has released pursuant to this Agreement, any demand, tender, notice, Claim, action, cause of action, suit, administrative complaint, or proceeding, relating to, arising out of or connected with, in whole or in part, the matters it has released.

7.     <u>Uncertainty of Facts and Law and Waiver of Civil Code Section 1542</u>.  Each Party acknowledges that there is a risk that, subsequent to the execution of this Agreement, it may incur, suffer, or sustain an injury, loss, damages, costs, attorneys' fees, expenses, or any of these, which relate to the Claims, the Action, or Hazardous Substances associated with dry cleaning operations in, at or emanating from the Site, which are unknown and unanticipated at the time this Agreement is signed, or which are not presently capable of being ascertained, and further that there is a risk that such damages as are known may become more serious than the Parties now expect or anticipate. The Parties further recognize that the law may change or their respective legal rights or remedies may change. Nevertheless, each of the Parties hereto acknowledges that this Agreement has been negotiated and agreed upon in light of these uncertainties and hereby expressly waive any rights that each Party may have in such unsuspected claims, rights, or damages except as provided in this Agreement.  In doing so, each Party has had the benefit of legal counsel and has been advised of, understands, and knowingly and specifically waives its rights, except as otherwise provided in this Agreement, under California Civil Code section 1542, which provides as follows:

> **A general release does not extend to the claims which the creditor does not know or suspect to exist in his or her favor at the time of executing a release which, if known by him or her, must have materially affected his or her settlement with the debtor.**

It is further acknowledged that nothing in this Agreement shall be construed to waive, release or otherwise prevent or restrict the ability of the Parties to enforce the terms and conditions of this Agreement.

8.     <u>Insurance Carve Out for Heinl</u>.  Notwithstanding the mutual releases and waiver set forth in Section 6 and 7, this Agreement does not release, acquit, waive, or discharge Heinl to the extent of insurance coverage, if any, not listed on **Exhibit 3** and exhausted by this Agreement as

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

of the time of the Effective Date of this Agreement.  This limited insurance "carve out" is intended to allow the Bank or Whitehurst to pursue claims against any unlisted and unexhausted insurance policies not identified on **Exhibit 3**, if any.  Whitehurst and the Bank hereby agree to and do hereby provide Ms. Heinl and Chicago Insurance Company, a Fireman's Fund Insurance Company, on behalf of its insured, Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners, with a covenant not to execute on any personal, real property, or trust assets of Ms. Heinl and Chicago Insurance Company, a Fireman's Fund Insurance Company, on behalf of its insured, Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners other than insurance assets not listed on **Exhibit 3**.  Any release, covenant not to execute, or waiver in this Agreement shall not be construed to prevent the Settling Parties from enforcing this Agreement.

9.    Limited Release and No Release for Third Parties.

   A.    Nothing in this Agreement shall be construed to waive or release any Claims that any Party may have against any person or entity not a Party to this Agreement. The Parties agree that nothing in this Agreement is intended to be, nor shall anything in this Agreement be construed as, a release or waiver of any Claim or cause of action or as a covenant not to sue to any person or entity not a party to this Agreement. Nothing in this Agreement shall in any way limit, restrict, or impair the rights of the Parties to assert claims and defenses against any persons or entities who are not parties to this Agreement. Nothing in this Agreement is intended as, should be construed as, or may be argued by any Party to this Agreement or non-party to be, a release or covenant not to sue for any Claim or cause of action, administrative or judicial, civil or criminal, past or future, in law or in equity, which any of the Parties may have against any person, firm, corporation, or other entity not a party to this Agreement.  The Parties to this Agreement do not intend to create any third party beneficiaries by this Agreement and agree that there are no third party beneficiaries to this Agreement.

   B.    The releases in this Agreement resolve disputes only as they relate to the Action and the Environmental Contamination.  The personnel responsible for this settlement have made no attempt to determine what other rights, duties, contracts, or relationships may exist between the Parties that are unrelated to the Action and the Environmental Contamination.  The releases given herein, to the extent they may involve parties with ongoing contractual relationships, are

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

not intended to, and do not, alter those contractual relations or any rights and obligations under those contracts which are not expressly released herein.

C.    To the extent any Party to this Agreement initiates an action or claim against a non-Party to this Agreement relating to this Action, Claims, or the Environmental Contamination, and the non-Party defendant or its insurance carrier files a third party action against another Party to this Agreement, the Party that initiated the action or claim shall indemnify, defend, and hold harmless the Party brought into the action or claim as a third party defendant.

10.    <u>Compliance with Regulatory Agency Requirements</u>.  Except as otherwise stated in this Agreement, the Bank or its designee shall take control of and be responsible for any and all requests or orders by any Regulatory Agency concerning investigation, remediation, monitoring, or mitigation measures related to or arising from the Remediation Project including all payments related thereto and any and all work required to investigate, remediate, monitor, mitigation measures, or resolve issues arising from or related to Hazardous Substances relating to Heinl's dry cleaning operations.  Such responsibilities shall end upon the issuance of a Final NFA letter from the Regulatory Agency with primary jurisdiction over the Remediation Project.

11.    <u>Miscellaneous Provisions</u>.

A.    <u>No Admission of Liability</u>.  This Agreement resolves claims which are denied and disputed by the Parties to this Agreement. Nothing contained in this Agreement is intended to constitute an admission of liability on the part of any Party, nor is any provision of this Agreement intended to constitute an admission that any claim of any Party has or lacks merit. This Agreement may not be used for any purpose other to enforce to the terms and conditions of this Agreement.

B.    <u>Non-Disparagement</u>.  The Parties shall not, directly or indirectly, make any negative or disparaging statements against each other maligning, ridiculing, defaming, or otherwise speaking ill of each other, or their business affairs, practices or policies, standards, or reputation (including but not limited to statements or postings harmful to business interests, reputation or good will) either: (1) in writing; or (2) verbally: (a) on any internet based social

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

media, (b) on any internet website or blog, (c) to the media, including persons and/or entities engaged in radio, television or internet broadcasting, or (d) to persons or entities that gather or report information on trade and business practices or reliability, which relate to this Agreement, the allegations made in this Action, or any matter covered by the releases in this Agreement. Nothing in the Agreement shall, however, be deemed to interfere with each Party's obligation to report transactions with appropriate governmental, taxing and/or registering agencies.

        C.     <u>No Tax Advice</u>.  None of the Parties has received or relied on any representation or advice by any other Party or its attorneys in connection with the tax consequences of this Agreement, and none of the Parties or their attorneys have made, or do make, any such representations.  Each of the Parties agrees to bear sole responsibility for payment and reporting of any and all taxes that may be owed by it as a result of the settlement reflected in this Agreement.

        D.     <u>Warranty of Authority</u>.  Each signatory to this Agreement represents and warrants that it has full authority to make this Agreement on behalf of each Party for whom/which s/he signs and agrees to hold each other Party harmless from any claims that such authority does not exist.

        E.     <u>Confidentiality</u>.  The Parties hereto and all others working with or through them, agree to keep this Agreement, each of its terms, and the claims being released herein, confidential and agree not to disclose any such information to anyone not a Party to this Agreement, except as set forth below.  If asked as to the status of the Action, the Parties and their attorneys and representatives shall state only that the Action has been settled.  Notwithstanding the foregoing, a Party or its counsel may communicate the terms and conditions of this Agreement: (i) to those rendering professional financial or legal advice to it so long as such disclosure is made on a confidential basis and remains subject to the confidentiality requirements of this Agreement; (ii) as required by court order or other compulsory process of law so long as, the producing Party designates the Agreement "Confidential" and requests a protective order to prevent disclosure beyond the proceeding in which the terms and conditions of this Agreement are produced; (iii) as required or necessitated by a financial, taxing or regulatory body or agency; (iv) as required in any communications with reinsurers; and (v) as would be needed in

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

connection with a motion to enforce this Agreement, as referenced in Section 5.B above.  In addition, notwithstanding the foregoing, this confidentiality provision does not prohibit or restrict any Party from responding to a request from, or otherwise communicating with, any securities regulatory agency or organization or other government organization.

   F. <u>Integration</u>.  This Agreement constitutes the entire agreement between the Parties relating to this subject matter, and its terms are contractual, not mere recitals. Except as specifically provided in this Agreement, this Agreement supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral. The Parties acknowledge that there have been no inducements or representations upon which any of the Parties have relied entering into this Agreement, except as expressly set forth in this Agreement.

   G. <u>Construction</u>.  Each Party acknowledges that it and its counsel have reviewed and had the opportunity to revise this Agreement and that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment or exhibits hereto. Each of the Parties agrees that this Agreement has been negotiated at arm's-length by parties of equal bargaining power, and each of the Parties declares and is satisfied that it was represented by competent counsel of its own choosing. The Parties further acknowledge that the obligations and releases herein described are in good faith and are reasonable in the context of the matters released.

   H. <u>Waiver of Attorneys' Fees and Costs</u>.  Except as otherwise provided in this Agreement, each Party shall bear its own costs, expenses and attorneys' fees arising out of or connected with the Action and administrative orders and any negotiation, drafting, implementation, execution and judicial approval of this Agreement.

   I. <u>Amendment or Modification</u>.  This Agreement may be amended or modified only by written instrument signed by all Parties or their successors in interest and approved by the Court.

   J. <u>Inaccuracies</u>.  No inaccuracies in the recitals hereof shall in any way affect the validity and/or enforceability of this Agreement.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

K.     Voluntary Agreement.  Each Party acknowledges that it has read this Agreement and is fully aware of the contents of this Agreement and its legal effect. This Agreement is entered into voluntarily and without any coercion by or undue influence on the part of any person, firm, or corporation.

L.     Independent Legal Advice and Investigation.  Each Party acknowledges that it has made such investigation of the facts pertaining to this Agreement and all matters contained herein as it deems necessary, desirable, or appropriate. In entering into this Agreement, each Party acknowledges that it has received independent legal advice from its own counsel and has relied on its own investigation and upon the advice of its own attorney with respect to the advisability of making the settlement provided in this Agreement.

M.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all such counterparts taken together shall be deemed to constitute one and the same instrument. This Agreement is not and shall not be effective, however, unless and until each Party executes the original or a counterpart. Facsimile or electronic copies of signatures have the same force and effect as the originals.

N.     Breach of Agreement.  No waiver or indulgence of any breach or series of breaches of this Agreement shall be deemed or construed as a waiver or any other breach of the same or any other provisions hereof nor affect the enforceability of any part or all of this Agreement, and no waiver shall be valid unless executed in writing by the waiving Party. Each Party agrees that if it breaches any representation or warranty expressly stated in this Agreement, it will indemnify and hold harmless the other Parties from the consequences of that breach.

O.     Attorneys' Fees.  In the event of any legal action to enforce this Agreement, the prevailing Party shall be entitled to all reasonable fees and costs, including attorneys' fees and expenses.

P.     Binding Effect of Agreement.  Except as otherwise specifically provided herein, this Agreement is and shall be binding upon and shall inure to the benefit of the Parties.

Q.     Exhibits and Attachments.  The Exhibits attached hereto are hereby incorporated herein by this reference for all purposes and as if set forth in full.

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

R.      <u>Controlling Law</u>.  This Agreement has been negotiated and entered into in the State of California involving real property within this state. The Parties agree that this Agreement shall be governed by and construed in accordance with, the laws of the United States and of the State of California. No Party shall argue or assert that any law other than California law applies to the governance or construction of this Agreement.

S.      <u>Agreement to Cooperate and Execute Documents</u>.  The Parties represent, warrant and agree to execute all documents and to do all things reasonably necessary to fully execute the terms of this Agreement.

T.      <u>Survival</u>.  The representations, warranties, agreements and promises made by each Party to this Agreement and specifically contained herein shall survive the execution of this Agreement.

U.      <u>Effect of Partial Invalidity</u>.  If any term or provision of this Agreement is found to be invalid, in violation of public policy, or unenforceable to any extent, such finding shall not invalidate any other term or provision of this Agreement, and such other terms and provisions shall continue in full force and effect. The Parties understand, intend, and agree that this Agreement and each of the terms, covenants, and provisions of this Agreement shall be enforced to achieve the purpose of this Agreement. If any part of this Agreement is found invalid or unenforceable, that part will be amended to achieve as nearly as possible the same economic effect as the original provision and the remainder of this Agreement will remain in full force.

V.      <u>Headings or Captions</u>.  The paragraph and other headings or captions used herein are of no legal significance or consequence. Such headings are merely for ease of reference and are not intended to alter, impact, or in any way amend the language within the paragraphs of this Agreement. Such headings or captions are not to be construed as part of the Agreement nor as a full or accurate description of the terms therein.

W.      <u>Notice</u>.  All notices or other communications that any Party desires or is required to give shall be given in writing and shall be deemed to have been given if hand delivered, sent and confirm by facsimile, sent and received by e-mail, or mailed by depositing in United States

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

mail prepaid to the Party at the address noted below or such other address as a Party may designate in writing from time to time:

| | |
|---|---|
| To Whitehurst: | Richard Whitehurst<br>1852 Bonanza Street<br>Walnut Creek, CA 94596 |
| With a Copy To: | John R. Till, Esq.<br>Paladin Law Group® LLP<br>1176 Boulevard Way<br>Walnut Creek, CA 94945<br>Telephone:  (925) 947-5700<br>Facsimile:  (925) 935-8488<br>jtill@PaladinLaw.com |
| To Bank: | Bank of America<br>13850 Ballantyne Corporate Place<br>NC2-150-03-06<br>Charlotte, NC  28277<br>Attn:  Lease Administration |
| With a Copies To: | Bank of America<br>214 N. Tryon St., 20th Floor<br>NC1-027-20-05<br>Charlotte, NC  28255<br>Attn:  Corp. Workplace Counsel, West Region<br><br>Todd O. Maiden, Esq.<br>Reed Smith LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA  94105<br>Telephone:  (415) 543 8700<br>Facsimile:  (415) 391 8269<br>tmaiden@reedsmith.com |
| To Heinl: | David F. Wood<br>Wood, Smith, Henning & Berman LLP<br>10960 Wilshire Boulevard, 18th Floor<br>Los Angeles, CA 90024<br>Telephone:  (310) 481-7601 |
| With Copy To: | Scott Osmus<br>Fireman's Fund Insurance Company<br>777 San Marin Drive<br>Novato, CA 94998<br>Telephone:  (415) 899-2488<br>Facsimile:  (415) 899-3663<br>scott.osmus@ffic.com |

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the
dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By: _[signature]_
Richard Whitehurst, individually and as trustee
for the Whitehurst Family Trust.

Date: March 11, 2015

By: _[signature]_ Lorraine Whitehurst
Lorraine Whitehurst, individually and as
trustee for the Whitehurst Family Trust.

Date: March 11, 2015

Approved as to form by:

Paladin Law Group® LLP

By: _[signature]_
John R. Till
Attorney for Whitehurst

Date: March 11, 2015

Approved as to form by:

Wood, Smith, Henning & Berman LLP

By: _[signature]_
David F. Wood
Attorney for Heinl

Date: March 20, 2015

**The Bank:**

Bank of America, NA

By: _[signature]_
Joe Ryan
Senior Vice President
Regional Property Director

Date: March 16, 2015

**Fireman's Fund:**

By: _[signature]_
Chicago Insurance Company, one of the
Fireman's Fund Insurance Companies, on
behalf of its insured, Charlotte Heinl, deceased

Date: March 23, 2015

Approved as to form by:

Reed Smith LLP

By: _____
Todd O. Maiden
Attorney for Bank of America, NA

Date: March ___, 2015

CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By: _____
Richard Whitehurst, individually and as trustee for the Whitehurst Family Trust.

Date: March 11, 2015

By: _____
Lorraine Whitehurst, individually and as trustee for the Whitehurst Family Trust.

Date: March 11, 2015

Approved as to form by:

Paladin Law Group® LLP

By: _____
John R. Till
Attorney for Whitehurst

Date: March 11, 2015

Approved as to form by:

Wood, Smith, Henning & Berman LLP

By: _____
David F. Wood
Attorney for Heinl

Date: March ___, 2015

**The Bank:**

Bank of America, NA

By: _____
Joe Ryan
Senior Vice President
Regional Property Director

Date: March 16, 2015

**Fireman's Fund:**

By: _____
Chicago Insurance Company, one of the Fireman's Fund Insurance Companies, on behalf of its insured, Charlotte Heinl, deceased

Date: March 23, 2015

Approved as to form by:

Reed Smith LLP

By: _____
Todd O. Maiden
Attorney for Bank of America, NA

Date: March 23, 2015

# EXHIBIT 1

# FIXED PRICE REMEDIATION AGREEMENT

This Fixed Price Remediation Agreement ("Agreement"), effective as of March 13, 2015, is entered into by and between The Source Group, Inc., a California corporation, ("CONSULTANT"), Bank of America, N.A. ("BANK"), and Richard G. Whitehurst, as individual and as trustee of the Whitehurst Family Trust (collectively, "PROPERTY OWNER").

## RECITALS

WHEREAS:

A.    BANK is former owner of real property at 2114 MacArthur Boulevard, Oakland, California and previously known as 2114-2116 MacArthur Boulevard, Oakland, California, and with prior APN numbers of 29A-1302-23-4, 29A-1302-24, and 29A-1302-25 and current APN of 29A-1302-051 (the "Site");

B.    PROPERTY OWNER is the current owner of the Site and has provided CONSULTANT access to the Site for purposes of performing this Agreement, as memorialized in the Access Agreement dated March 11, 2015, which is attached to this Agreement as **Attachment A**;

C.    The Site, along with adjacent properties located in the vicinity, is zoned for commercial/industrial use and is being used for commercial/industrial use;

D.    There is Environmental Contamination, as further defined below, within the soil, soil gas, and groundwater on, under, in the vicinity of, and/or emanating from the Site consisting of hazardous substances, including chlorinated solvents -- specifically, perchloroethylene, aka "PCE" or "perc," and its degradation products;

E.    BANK and PROPERTY OWNER desire that CONSULTANT implement the remediation of Environmental Contamination directly or indirectly related to past dry cleaning operations at the Site and obtain a "No Further Action" determination for active remediation from the California Regional Water Quality Control Board – San Francisco Bay Region ("RWQCB");

F.    Funds for such remediation are held in that certain Remediation Escrow Account pursuant to the Settlement Agreement and Release ("SETTLEMENT AGREEMENT") entered into by and between: (a) PROPERTY OWNER; (b) Fireman's Fund Insurance Company ("Fireman's Fund") on behalf of Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners (collectively hereinafter "Heinl"); and (c) BANK on or about March 13, 2015, a copy of which is attached to this Agreement as **Attachment B**;

G.    CONSULTANT is qualified and competent to perform the Work and has had an adequate opportunity to visit the Site and review publicly available information relating to the Site;

H.     BANK and PROPERTY OWNER have made available to CONSULTANT all relevant information in their possession and of which they are aware regarding the existing contamination and subsurface conditions of the Site.

NOW, THEREFORE, in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

## TERMS AND CONDITIONS

1. **Definitions**

A.     "CONSULTANT'S Equipment" is defined as blowers, environmental testing equipment, pumps, valves, controllers, air stripper, and similar equipment including all existing remediation equipment at or which will be brought to the Site.

B.     "Environmental Contamination" means Hazardous Substances[1] from or associated with, directly or indirectly, with past dry cleaning operations, including without limitations, those substances commonly associated with dry cleaning operations (specifically, perchloroethylene, aka "PCE" or "perc," and its degradation products) in, at, under, in the vicinity of, or emanating from the Site, which are required by the RWQCB to be investigated and remediated.

C.     "Lead Agency" is defined as the RWQCB and any successor agency which asserts jurisdiction in lieu of the jurisdiction currently exercised by the RWQCB.

D.     "Project Completion" is defined as when the Lead Agency issues a written statement or statements in the form of a No Further Action ("NFA") letter or letters confirming that: (i) the subsurface soils of the Site have been remediated to a level that will allow commercial/industrial uses on ground level of the Site, in compliance with applicable Hazardous Substances laws and regulations; and (ii) no further or additional investigation, monitoring, remediation, mitigation, or other action is required to address the Environmental Contamination.

E.     "Project Manager" is the representative of BANK and has the meaning as set forth in Section 4.A of the SETTLEMENT AGREEMENT, the provisions of which regarding

---

[1] "Hazardous Substances" means any hazardous waste, solid waste, hazardous material, or hazardous substance as defined in any federal, state or local statute, ordinance, rule, or regulation including without limitation (i) the substances included within the definition of the term "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601(14), and regulations promulgated thereunder, as amended; (ii) the substances included within the definition of the term "hazardous substances" under the California Hazardous Substance Account Act, California Health and Safety Code § 25300 *et seq.*, and regulations promulgated thereunder, as amended; (iii) any "pollutant or contaminant" under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (iv) any "solid waste" under Section 1004(27) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903(27); and any "hazardous waste" or "extremely hazardous waste" under 22 California Code of Regulations Section 66600 *et seq.*

management of the remediation project are included in **Attachment B**;

F.      "Remediation" is defined as any activity to actively address Environmental Contamination, or any activity involving removal, disposal, monitoring or sampling, treatment (including *in-situ* treatment) or neutralization of Environmental Contamination in groundwater, soils or soil gas at, on, under or emanating from the Site.  Remediation includes use of engineering and/or institutional controls, consistent with commercial/industrial use of the Site.

G.      "Work" means all tasks, including without limitation, all administration, drafting, investigation, meetings, negotiation, permitting, planning, public participation, remediation (both active and passive), removal, reporting, sampling, analysis and short-term and long-term monitoring, required by the Lead Agency so as to achieve Project Completion, and restoration of the Site as required by the Access Agreement (specifically, **Attachment A to Attachment D**).

2.   <u>Representations, Warranties and Covenants</u>.

A.   CONSULTANT represents and warrants to BANK and PROPERTY OWNER:

(1)   it has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

(2)   the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action on its part; and

(3)   it shall perform the Work under this Agreement in a safe and workmanlike manner and in compliance with all applicable laws and with the applicable standard of care for this professional, including without limitation the usual thoroughness and competence of this profession.

B.   BANK and PROPERTY OWNER represent and warrant to CONSULTANT:

(1)   they have full power and authority to execute and deliver this Agreement and to perform their obligations hereunder;

(2)   the execution, delivery and performance of this Agreement have been duly authorized by all necessary action on their part;

(3)   they have supplied CONSULTANT with all data in their possession or under their control related to the Environmental Contamination; and

(4)   BANK has the right, power and authority to direct and cause payment to be made to CONSULTANT at the Contract Price (as defined below) in accordance with this Agreement from the Remediation Escrow Account pursuant to the SETTLEMENT AGREEMENT.

3.   **Services To Be Performed.**

A.   CONSULTANT agrees to perform on BANK'S and PROPERTY OWNER's behalf all services necessary to complete Remediation of Environmental Contamination, and otherwise achieve Project Completion as defined in Paragraph 1.D.  CONSULTANT's obligations under this Agreement shall be complete upon Project Completion.

B.   It is CONSULTANT'S responsibility to achieve Project Completion for the Contract Price regardless of whether:

(1)  additional Environmental Contamination is discovered; and/or

(2)  Environmental Contamination is significantly greater than previously determined by SGI or previously unknown concentrations of Environmental Contamination are identified subsequent to execution of this Agreement.

C.   BANK, PROPERTY OWNER, and CONSULTANT recognize and agree that CONSULTANT may make modifications to the technical approach to Remediation, if approved by the Lead Agency, which may include removal, active remediation, soil-vapor control, soil and groundwater bio-remediation, on-site soil treatment and/or disposal, risk-based cleanup and/or monitored natural attenuation.  CONSULTANT may propose Lead Agency-approved engineering and institutional controls consistent with commercial/industrial use of 2114 MacArthur Blvd and consistent with the exemplar deed restriction attached as Exhibit 2 to the SETTLEMENT AGREEMENT.

D.   CONSULTANT shall, at its sole cost and expense, properly handle and dispose of waste generated as a result of CONSULTANT's activities required for Project Completion and/or related to Remediation of Environmental Contamination, including but not limited to contaminated clothing, equipment, equipment washwater, samples, extracted groundwater, contaminated rainwater in the excavation pit(s), any visqueen or other membrane upon which excavated soils are treated, and any excavated contaminated soils, and will obtain and/or submit all necessary regulatory approvals, requests, and or notifications.

E.   CONSULTANT shall pay any and all oversight costs, fees, expenses, and taxes imposed by the Lead Agency or by any other regulatory agencies, such as City of Oakland permits, which are required for Project Completion and/or Remediation of Environmental Contamination.

4.   **Status.**

A.   CONSULTANT is a licensed general engineering contractor certified for hazardous substance removal (State Contractor's License No. 758173, with hazardous materials handling license), authorized to conduct business in the State of California.

B.   CONSULTANT shall perform its Work as an independent contractor, and shall have responsibility for and control over the details of and means for performance of the Work described herein.

C.   The employees furnished by CONSULTANT to perform services are the CONSULTANT'S employees exclusively without any relation whatever to BANK or PROPERTY OWNER as employees, agents or independent contractors.  Those employees shall be paid by CONSULTANT for all services in connection with this Agreement.  CONSULTANT is responsible for all obligations, payments and reports required by Social Security, Unemployment Insurance, Worker's Compensation, Income Tax and all other local, state or federal laws related to employer-employee obligations. CONSULTANT agrees to hold harmless, indemnify, and reimburse BANK and PROPERTY OWNER for any taxes, premiums, assessments and other liabilities (including penalties and interest) that BANK or PROPERTY OWNER may be required to pay due to CONSULTANT'S breach of this paragraph.

5.   **Payment for Services and Notices.**

A.   Pursuant to the procedures set forth below, CONSULTANT shall be paid $2,050,000 (the "Contract Price") for all Work necessary to achieve Project Completion, including without limitation additional work resulting from conditions described above in Section 3.B due to, among other things, discovery of additional Environmental Contamination subsequent to the execution of this Agreement.

B.   CONSULTANT will submit to the Project Manager, as defined in the SETTLEMENT AGREEMENT, and the Payor, as defined under the SETTLEMENT AGREEMENT, periodic Invoices for payment generally consistent with the schedule set forth in **Attachment C**.  All Invoices shall be signed by Peter Fuller or Paul Horton of The Source Group, Inc. and shall certify that CONSULTANT has provided or will provide the services described in the Invoice.

C.   Each SGI Invoice shall be accompanied by a conditional waiver and release in the form specified by California Civil Code section 8132 ("Conditional Waiver and Release in Exchange for Progress Payment") with respect to any payment invoiced by any subcontractor for services performed by the subcontractor prior to the date of the SGI Invoice which services have not been reimbursed, or for which there is any outstanding lien.  Once payment is received by SGI corresponding to such payment made by SGI to any subcontractor for services performed as specified in a previously submitted conditional waiver and release, then SGI, in the next applicable invoice period, shall submit an unconditional waiver and release for such subcontractor payment in the form specified by California Civil Code section 8134 ("Unconditional Waiver and Release in Exchange for Progress Payment").  Upon final payment by SGI to any such subcontractor, then SGI shall provide an unconditional waiver and release for final payment for any such final subcontractor payment in the form specified by California Civil Code section 8138 ("Unconditional Waiver and Release in Exchange for Final Payment").

D.   BANK shall pay, or cause to be paid from the Remediation Escrow Account, each Invoice no later than thirty (30) calendar days from the date received by the Project Manager or Payor, unless objections to payment are made pursuant to section 4.D of the SETTLEMENT AGREEMENT.  If any portion of the Contract Price remains unpaid as of Project Completion, the unpaid portion shall be paid in full no later than thirty (30) days after CONSULTANT provides written notice of Project Completion to the Project Manager and the Payor, unless objections to payment are made pursuant to Section 4.D of the SETTLEMENT AGREEMENT.

E.   In the event that CONSULTANT defaults or otherwise fails to properly perform under this Agreement, then at the option of BANK, exercised by written notice to CONSULTANT and PROPERTY OWNER, no further payments shall be made under this Agreement and all remaining funds in the Remediation Escrow Account may be used by BANK to retain others to achieve Project Completion.  In the event that BANK defaults or otherwise fails to properly perform under this Agreement, then at the option of CONSULTANT, exercised by written notice to BANK and PROPERTY OWNER, no further services shall be performed by CONSULTANT and all obligations of CONSULTANT under this Agreement shall terminate, provided that CONSULTANT takes measures appropriate to the applicable professional standard of care and/or required by law to secure the Site to prevent harm or injury to persons and personal and/or real property.  PROPERTY OWNER is an expressed intended third party beneficiary of this Agreement and shall have standing in any action arising from any such alleged or actual default of this Agreement.

6.   **Taxes and Costs**.

A.   CONSULTANT shall solely pay all taxes, tariffs, fees, or surcharges imposed by the State of California or the United States or any other state on spent carbon and other waste generated as part of Remediation.  CONSULTANT shall also pay the costs for obtaining and maintaining any permits required to conduct the Remediation of the Environmental Contamination and/or achieve Project Completion.  Lead Agency oversight costs shall be paid as set forth in the Settlement Agreement between the Settling Parties.

B.   CONSULTANT shall solely pay directly or otherwise reimburse BANK and/or PROPERTY OWNER for all utility costs required or otherwise used by SGI in connection with the Work, including, without limitation, all power, water and sewer charges.

///

///

7.  **Insurance**.

For the duration of the Work performed by CONSULTANT pursuant to this Agreement, CONSULTANT shall provide BANK and PROPERTY OWNER with certificates evidencing the insurance in the minimum amounts set forth below and shall add BANK and PROPERTY OWNER as additional named insureds to such policies.

| Coverage | Limits |
|---|---|
| Worker's Compensation and | Statutory |
| Employer Liability | $1 Million |
| combined single limit | |
| | |
| Commercial General Liability | $2 Million |
| including bodily injury | combined single limit bodily injury and broad |
| form blanket contractual liability | property damage |
| | |
| Automobile Liability | $2 Million |
| Owned, non-owned, hired | combined single limit |
| | |
| Professional Liability | $2 Million per occurrence/ |
| including errors & omissions, | annual aggregate pollution liability, including |
| bodily injury, property damage and clean-up | |

8.  **Liens**

CONSULTANT agrees to keep the Site and all structures and other improvements thereon, free and clear of mechanics', materialman's, and other liens for labor, services, or materials provided or used on or about the Site in connection with any Work CONSULTANT, or its agents, employees, representatives, independent contractors, subcontractors or consultants may make or permit or cause to be made on or about the Site unless BANK fails to properly pay CONSULTANT for services rendered under the payment terms in Section 5 above.

9.  **Access.**

CONSULTANT and its subcontractors shall have access to the Site and the driveway area adjacent to the Site on the BANK's property at 2154 MacArthur Blvd., without charge, pursuant to the terms and conditions set forth in the Access Agreements, attached to this Agreement as **Attachment A** and **Attachment D,** respectively.

10.  **Safety and Compliance with Laws**.

A.   CONSULTANT places the highest priority on safety and health during the progress of Work. Therefore, it shall be the responsibility of CONSULTANT to provide and maintain a safe working environment for its employees, CONSULTANT's employees and their subcontractors and agents.

B.   CONSULTANT shall provide a Health & Safety Plan for its employees covering any exposure to hazardous materials (as defined in the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, and 40 C.F.R., Part 261) and shall complete all Work in accordance with that Plan.  In addition to general safety and health guidelines, CONSULTANT may provide a Site-specific Health & Safety Plan.

C.   In performance of this Agreement, CONSULTANT shall comply and require any subcontractors acting under its direction to comply with all laws, ordinances, rules and regulations whether federal, state or local which are in effect during the term of this Agreement.  CONSULTANT, and any subcontractors acting under its direction, shall take reasonable precautions for the safety of all authorized persons entering the Site or any off-Site locations where Work is performed and shall perform all operations at the Site or off of the Site in compliance with all applicable regulations to protect the safety and health of employees.  These regulations include (but are not limited to):

- Hazardous Waste Operations and Emergency Response, 29 C.F.R. 1910.120 — including responsibility for and documentation of required training, Property control and monitoring responsibilities, emergency response plan, sanitation, and illumination;

- Hazard Communication, 29 C.F.R. 1910.1200 - written hazard communication plan, Material Safety Data Sheet;

- Permissible Exposure Limits, 29 C.F.R. 1910.1000 (and other substance-specific standards) - evaluation and/or monitoring of possible hazards, responsibility for exposure controls;

- Respiratory Protection, 29 C.F.R. 1910.134 - including written plan, respirator selection and training and maintenance responsibilities; and

- Protective Equipment, 29 C.F.R. 1910 Subpart I - regulatory and local requirements as applicable.

11.   **Disposal/Handling of Wastes**

CONSULTANT shall be responsible for properly handling and disposing of waste generated during CONSULTANT's activities under this Agreement.  BANK and PROPERTY OWNER shall be listed as the generator on any manifests issued pursuant to this Agreement.  All waste generated by CONSULTANT shall be manifested under BANK's and PROPERTY OWNER's generator identification number and an authorized representative of CONSULTANT shall sign any such manifests if requested by PROPERTY OWNER or BANK.  The fees for transportation and disposal of such wastes are included in the Contract Price. Any such waste materials encountered by or associated with the Work will be the property of the BANK and PROPERTY OWNER. CONSULTANT will not accept title to, or take control of any wastes.  PROPERTY OWNER and BANK shall indemnify and hold harmless CONSULTANT from any claims,

costs, damages, fines and attorney's fees, litigation costs or expenses, arising out of or in any way related to the handling, transportation and disposal of any wastes in the course of CONSULTANT's performance of this Agreement unless caused by negligence or willful misconduct of CONSULTANT.

12.   **Reports and Materials.**

A.   During the performance of the Work, CONSULTANT shall submit to the Project Manager quarterly progress reports on the actual progress and updated schedules, and shall promptly provide copies of all correspondence, reports and other materials delivered to or received from the Lead Agency.

B.   CONSULTANT shall submit drafts of all reports, work plans, remedial action plans, and any revisions requested for the RAP or New Order to the Project Manager prior to submission to the Leady Agency.  The Project Manager shall have fifteen (15) days to review the document and provide comments to CONSULTANT.  CONSULTANT shall incorporate such comments when feasible and consistent with the technical and regulatory approach of CONSULTANT and shall explain to the Project Manager the reasons for any decision by CONSULTANT not to incorporate any of the Project Manager's comments. Upon request of the Project Manager, CONSULTANT shall meet the Project Manager at the Site or at another mutually agreeable location to discuss such comments. CONSULTANT reserves the right to make the final decision on the contents of all documents submitted to a Regulatory Agency to the extent such contents are required with respect to the Work or Project Completion.  The Project Manager shall have the right to dispute, in good faith, such contents before the Lead Agency or any other applicable Regulatory Agency.

C.   Notwithstanding the foregoing, or anything to the contrary contained herein, the BANK and PROPERTY OWNER shall have the final decision on the contents of all documents submitted to the Water Board or any Other Regulatory Agency to the extent related to contamination that is not an Environmental Condition (or that CONSULTANT contends is not an Environmental Condition) as defined in this Agreement, and on matters not required to be reported for the purpose of performing the Services or achieving Project Completion.

D.   CONSULTANT shall provide to BANK and PROPERTY OWNER an electronic copy of all reports, information and communications from CONSULTANT to the Lead Agency or any other regulatory agency.   Similarly, if requested by CONSULTANT, BANK or PROPERTY OWNER shall provide to CONSULTANT a paper or electronic copy of all reports, information and communications from or between BANK or PROPERTY OWNER and the Lead Agency or any regulatory agency relating to the Site.

E.   CONSULTANT shall retain all existing remediation equipment and all materials resulting from CONSULTANT's Work under this Agreement, including documents, calculations, maps, photographs, drawing, remediation equipment, computer printouts, notes, samples, specimens and any other pertinent data maintained  by  CONSULTANT.

CONSULTANT shall keep all documents and information generated by its Work for a period of ten (10) years after Project Completion.  Prior to destruction of any documents or information by CONSULTANT related to its Work under this Agreement, 60 day notice shall be provided to BANK and PROPERTY OWNER who will each have the ability to obtain copies of any or all of documents and information generated by CONSULTANT's Work.

      F.   Any and all reports and materials produced by CONSULTANT during the performance of this Agreement are not intended or represented to be suitable for reuse by BANK or PROPERTY OWNER or others on any other project or for any purpose. Reuse of said reports and other materials by BANK or PROPERTY OWNER or any other party on other projects shall be at BANK's or PROPERTY OWNER's sole risk, without any liability on CONSULTANT's part.

**13.**   **Indemnification.**

      A.   CONSULTANT agrees to defend, indemnify and hold harmless BANK and PROPERTY OWNER from any claims, loss, injury, liabilities, damage, fines, causes of action, attorney's fees, costs and litigation expenses (collectively, "Claims") incurred by BANK or PROPERTY OWNER or asserted against BANK or PROPERTY OWNER by any person or entity, proximately caused by, in whole or in part by CONSULTANT's negligence or intentional misconduct.  Attorney's fees and litigation expenses recoverable under this paragraph include fees, costs and expenses incurred in establishing a party's right to indemnification.

      B.   BANK and PROPERTY OWNER agree to defend, indemnify and hold harmless CONSULTANT from any Claims incurred by CONSULTANT or asserted against CONSULTANT by any person or entity, proximately caused by, in whole or in part by negligence or intentional misconduct by BANK or PROPERTY OWNER, with BANK and PROPERTY OWNER sharing such expense in proportion to each other's own fault. Attorney's fees and litigation expenses recoverable under this paragraph include fees, costs and expenses incurred in establishing a party's right to indemnification.

      C.   BANK and PROPERTY OWNER shall defend, indemnify and hold harmless CONSULTANT and its owners, officers, directors, employees and agents (collectively, "Indemnitees") against any third party Claims resulting from hazardous materials or Environmental Contamination on, at, under or emanating from the Site, excepting new releases specifically caused by CONSULTANT'S Work or resulting from CONSULTANT'S negligence or intentional misconduct.  Any indemnitee under this Paragraph C shall have the right, but not the duty, to participate in the defense of any such claim or suit with attorneys of its own selection at its own expense without relieving the indemnitor of any obligations hereunder.

   ///

14. **Dispute Resolution**.

   A.   Except to the extent it may invalidate or prejudice any insurance coverage of either party:  (i) all disputes between BANK and/or PROPERTY OWNER, on the one hand, and CONSULTANT, on the other, arising out of or related to this Agreement shall be decided by alternate dispute resolution procedures as mutually agreed, and (ii) in the absence of such agreement, disputes shall be decided by arbitration in accordance with the existing Commercial Arbitration Rules of the American Arbitration Association.

   B.   To initiate arbitration, a party to this Agreement must issue written notice of a demand for arbitration to the adverse party and to the American Arbitration Association within reasonable time after the dispute has arisen, and in no event after the date when the institution of court proceedings based on such dispute would be barred by the applicable statute of limitations.

   C.   Costs of arbitration shall be apportioned between the parties as the arbitrator(s) may decide that the non-prevailing party must bear said costs and attorney's fees.

   D.   The arbitrator's award shall be final.  The award and this agreement to arbitrate may be specifically enforced by any court having jurisdiction thereof.

15. **Confidentiality**.

   A.   CONSULTANT, BANK, and PROPERTY OWNER shall each hold confidential all business or technical information obtained from each of the parties to this Agreement and from their affiliates or generated in the performance of the Work under this Agreement. BANK, CONSULTANT, and PROPERTY OWNER shall not disclose such information without written consent from each of the parties to this Agreement, except to the extent required for:  (1) performance of the Work under this Agreement; (2) compliance with professional standards of conduct for preservation of the public safety, health, and welfare; (3) compliance with any court order or other governmental directive; (4) protection of BANK, PROPERTY OWNER, or CONSULTANT against claims or liabilities arising from performance of services under this Agreement; (5) compliance with any other law or regulation, or (6) litigation involving Environmental Contamination.  The parties' obligations hereunder shall not apply to information in the public domain or lawfully acquired on a non-confidential basis from others.

   B.   Prior to any disclosure pursuant to this Section 15, the disclosing party shall provide advance written notice to the other party that it intends to disclose such information.

16. **Applicable Law.**

   This contract shall be interpreted, construed, and enforced in accordance with the laws of the State of California applicable to contracts made and to be performed in California.

17. **Severability.**

   If any provision of this Agreement is determined by a court to be invalid or unenforceable, the remainder of this Agreement shall remain in full force and effect. Further, such provision shall be reformed and construed to the extent permitted by applicable laws so that it would be valid, legal and enforceable to the maximum extent possible.

18. **Waiver.**

   Any waiver by any party of any provision or condition of this Agreement must be in writing and signed by the party to be charged and shall not be construed or deemed to be a waiver of any other provision or condition of this Agreement, nor a waiver of a subsequent breach of the same provision or condition, unless such waiver expressly so states.

19. **Headings.**

   Section headings used in this Agreement are used solely for the convenience of reference and shall not amplify, limit, modify or otherwise be used in the interpretation of any provisions of this Agreement.  The numbering system is also included for convenience only.

20. **Counterparts and Facsimile Signatures.**

   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same agreement.  CONSULTANT, BANK, and PROPERTY OWNER also agree that a facsimile copy or photocopy of this document executed by the parties shall be of full effect as the original document for all purposes.

21. **Amendments.**

   This Agreement may not be amended, changed, modified, released or discharged except by a writing signed by duly authorized officers of each of the parties hereto or their successors or permitted assigns.

22. **Notice.**

   Except as otherwise specified herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been received (a) in the case of notice by letter, when delivered by hand or three (3) days after the same is deposited in the registered or certified mail, first class postage prepaid; (b) in the case of notice by telefax, when sent and confirmed; and (c) in the case of email, when sent and confirmed, and shall be addressed to them as follows or at such other address

as the parties hereto may designate by written notice to the other party hereto:

If to CONSULTANT:
**The Source Group, Inc.**
Mr. Peter Fuller
3451-C Vincent Road
Pleasant Hill, CA 94523
Tel: (925) 951-6401
Fax: (925) 944-7019
pfuller@thesourcegroup.net

If to BANK:
**Reed Smith, LLP**
c/o Mr. Todd Maiden
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel: (415) 659-5918
Fax: (415) 659-5985
tmaiden@reedsmith.com

If to PROPERTY OWNER:
**Paladin Law Group® LLP**
c/o John R. Till Esq.
1176 Boulevard Way
Walnut Creek, CA 94945
Tel: (925) 947-5700
Fax: (925) 935-8488
jtill@PaladinLaw.com

24. **Entire Agreement.**

    Except for the Access Agreement between PROPERTY OWNER and
CONSULTANT, this Agreement (including the attached Schedules) constitutes the entire
agreement between BANK, PROPERTY OWNER, and CONSULTANT, and supersedes
all prior or contemporaneous oral or written representations or agreements.  In addition,
this Agreement does not supersede any outstanding balances, if any, required to be paid
by BANK for prior work related to the Environmental Contamination.  This Agreement

    ///

    ///

    ///

Page 13 of 14

shall not be modified except with documents signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of March 13, 2015.

| CONSULTANT:<br>The Source Group, Inc.<br><br><br>By: _____<br><br>Its: _____<br><br>Dated: March ___, 2015 | BANK<br>Bank of America, N.A.<br><br>By: _JOSEPH RYAN_____<br><br>Its: _SVP/ PROP. DIRECTOR___<br><br>Dated: March 16, 2015 |
| --- | --- |
| PROPERTY OWNER<br>Richard Whitehurst, as trustee for the Whitehurst Family Trust<br><br>By _____<br><br>Its: _trustee_____<br><br>Dated: March 11, 2015 | |

[END OF DOCUMENT]

# ATTACHMENT A

Attachment A

## ENVIRONMENTAL ACCESS AGREEMENT

This Environmental Access Agreement ("Agreement") is entered into this
___ day of March, 2015, between Whitehurst Family Trust ("Permittor" or
"Property Owner"), and The Source Group, Inc., a California corporation
("Permittee").

## RECITALS

A.   Permittor is the owner of that certain real property located at 2114
MacArthur Boulevard, Oakland, California 94602 ("Property").  As between the
Parties to the Agreement, this Agreement governs any location which is being
investigated or remediated as potentially related to contamination on, at,
originating from, or emanating from past business operations at the Property
(collectively, the "Site").

B.   Permittee is The Source Group, Inc., an environmental consulting firm
headquartered in Pleasant Hill, California, whose address is: 3478 Buskirk Avenue,
Suite 100, Pleasant Hill, California 94523.

C.   Permittee plans to conduct work at and in the vicinity of the Property
and surrounding properties, for the purpose of conducting environmental activities,
including environmental sampling, environmental cleanup and remediation
activities, or any investigation or remediation necessary under that certain Fixed
Price Remediation Agreement (hereafter, "FPRA"), dated March ___, 2015, with

Attachment A

Permittee, concerning the Site and surrounding properties and agreeing to obtain a

No Further Action letter for the Property and Site (collectively, the "Work").

D.      Permittor is willing to grant Permittee access to the Property to

perform the Work on the following terms and conditions.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration the receipt and

sufficiency of which are hereby acknowledged, Permittor and Permittee agree as

follows:

1.      Limited Grant of Access.    Permittor grants Permittee and its

representatives a non-transferable and non-exclusive license to access the Property

to perform the Work as directed or approved by the San Francisco Bay Regional

Water Quality Control Board and as contemplated by the FPRA.

2.      Term.  This grant of access shall be for a period of time ending ninety

(90) days after the completion of Work on the Property, including restoration of

Property as set forth on Attachment A, and a NFA letter is received from the Lead

Agency.  Renewal or extension shall be upon the mutual written consent of both

parties.

3.      Limited Access.  The permission granted by this Agreement is

exclusively for the purpose of performing the Work.  No other activities or

equipment shall be conducted or located on the Property without the advance

Attachment A

express written consent of Permittor, which reserves the right to withhold such consent but such consent shall not be withheld unreasonably.  Prior to performing any of the Work on the Property, Permittee shall provide Permittor with a description of the Work to be completed at, within, or upon the Property; the location of the installation(s); who will perform the Work; and the methods and procedures that will be used to perform the Work.

No additional work or changes at the Property may be undertaken by Permittee without the express written consent of Permittor, and Permittor reserves the right to withhold such approval but such approval shall not be withheld unreasonably.

Permittee may not use or cause to be used, stored, or disposed of any substance, material, or waste, whether solid, liquid, or gas, that is designated by any governmental authority, or prohibited, or regulated by any Laws (as defined below), as toxic, reactive, corrosive, ignitable, flammable, infectious, hazardous, or otherwise a danger to human health or the environment ("Hazardous Substances") on or at the Property unless required for the Work.

4.  <u>Compliance with Laws</u>.  Permittee and its representatives shall obtain, at their sole cost and expense, all necessary permits and authorizations from governmental entities and agencies and comply with all current and future laws, ordinances, orders, rules, regulations, and permits (collectively, "Laws") with

Attachment A

respect to the performance of the Work.  Permittee and its representatives will properly, and in compliance with all Laws, and at their sole cost and expense, handle, store, treat, transport, and/or dispose of off the Property, as necessary, any waste, including, without limitation, soil and groundwater, generated during the Work, except upon the express written consent of Permittor. Permittee shall not leave any soil, water, chemicals, or waste generated during performance of the Work on the Property, except as outlined in this Agreement and as expressly permitted by the RWQCB.  It is understood that during the course of the Work soil and water may be generated and stored in sealed drums, waste bins, or on plastic sheeting on the Property pending laboratory data dictating the proper disposal method.  Permittee is responsible for securing, storing, and removal of any and all drums at the Property generated by the Work. Once a disposal method has been determined, the storage drums will be manifested off site at the cost and expense of Permittee.  It is understood that it could take up to ninety (90) days to have the drums removed from the Property, and Permittor grants that these storage drums may be stored on the Property for up to ninety (90) days at the Property without prior written approval from the Permittor.

Consistent with the foregoing, Permittee shall arrange for and obtain a secure storage container to be placed on the Property for the storage of any soil, water, chemicals, or waste generated during the performance of the Work at the

Attachment A

Site. Permittee shall obtain permission from all necessary governmental entities or agencies prior to placing the storage container on the site. Permittee shall, at its sole cost, take over responsibilities for fencing the Property until a no further action letter is received for the Property.

5.    <u>Notice of Work at Property</u>. Permittee or its representative shall provide Permittor with written notice of its intent to enter the Property at least (5) business days prior to the commencement of any Work. If Permittor does not respond to Permittee's or Permittee's representatives' notice of entry within two (2) business days of Permittor's receipt of notice, Permittor shall be deemed to have approved the schedule set forth in the notice for entry. Notwithstanding the foregoing, Permittee or its representative may in the event of an emergency (emergency shall not include Work) enter onto the Property without prior notice, provided that Permittee or its representative shall subsequently notify Permittor of the fact of and reason for such entry.

6.    <u>Non-Interference with Use</u>. Permittee and its representatives shall not injure or interfere with the use, occupation, or enjoyment of the Property by Permittor, or those holding under Permittor, including but not limited to future tenants or subtenants, agents, employees, guests, or invitees, except to the extent necessary for the efficient and proper installation, sampling, monitoring, maintenance and removal Work set forth in the FPRA.

Attachment A

7. <u>Safety and Security Precautions</u>. Permittee and its representatives shall take all reasonable and necessary safety and security precautions in connection with the Work, including, without limitation, locating underground utilities. Permittee and its representative shall monitor the Work to ensure that it is conducted safely, and that the Work does not represent a threat to health or safety to the persons or property at or near the Property. Permittee shall immediately correct any condition arising from the Work that could adversely affect the health or safety of any persons or property at or near the Property. Permittor shall have no responsibility to provide security for the Work. Permittee shall be solely responsible for ensuring that Permittee and its representatives comply with OSHA or other safety-related regulations and Laws.

8. <u>Mechanic's Liens</u>. Permittee and its representatives shall keep the Property free from any mechanic's liens arising out of any Work, work performed, materials furnished or obligations incurred by Permittee or its representatives. In the event that Permittee does not within ten (10) calendar days following the imposition of any such lien, cause the same to be released of record, Permittor shall have the right, but not the obligation, to cause the same to be released by such reasonable means as Permittor shall deem proper, paid by Permittor for such purpose, and all reasonable expenses (including without limitation attorneys' fees and costs) incurred by Permittor in connection therewith, shall be immediately

Attachment A

payable by Permittee on demand to Permittor.  Permittee's obligations under this

Paragraph 7 shall survive the expiration or earlier termination of this Agreement.

9.     <u>Copies of Data and Communications</u>.  At Permittee's sole cost and

expense, Permittee shall promptly (*i.e.* within twenty (20) calendar days of

receiving any writings) provide Permittor with an electronic or hard copy of

documents, information, lab data, soil, water, and vapor studies and tests, or data

related to the Work at the Site.

10.     <u>Permittee's Property and Equipment</u>.  All tools, equipment, or other

personal property, except as designed to be installed pursuant to the Work, shall be

removed from the Property within ten (10) business days of the Property receiving

a No Further Action letter.  However, Permittee or its representatives shall assume

all expenses, liabilities, and risks associated with any and all tools, personal

property, equipment, or other items associated with the Work at the Site. In the

event that Permittee desires to retain overnight security personnel, at its sole cost,

to ensure the safety of items left on the Property overnight, said security personnel

will be allowed on the Property.

Unless this Agreement is renewed pursuant to Paragraph 2, Permittee at its

sole cost and expense, shall remove any and all installations on the Property and

shall promptly restore the portions of the Property affected by the Work as required

by the Work or as set forth on Attachment A.

Attachment A

11.    <u>Oversight and Monitoring</u>.  In consideration of this Agreement and as part of Permittee's obligations under the FPRA to investigate and remediate the Site, Permittee shall allow for Permittor to observe any Work by Permittee or its representatives at the Site at Permittor's own expense.  Permittor's observation may include, but is not limited to, the taking of split samples or taking of additional air, soil or groundwater samples during Work at the Site at Permittor's own expense. Furthermore, Permittee agrees to coordinate with Permittor's representatives to set a schedule for the Work for the next quarter.  If Permittor or its representatives' request to take split samples, groundwater or soil sample splits shall not exceed twenty-five (25%) of the samples to be taken by Permittee or its representatives at the Site with Permittor to bear its own cost and expense, including, but not limited to, laboratory expenses.

12.    <u>Indemnification of Permittor by Permittee</u>.  Permittee shall protect, indemnify, defend and hold Permittor and its affiliates, as well as the holder of any mortgage, deed of trust or other security interest encumbering the Property, or any interest therein, and the officers, directors, agents, partners, employees, and tenants of each of them, and their respective heirs, successors and assigns (collectively, "Permittor Group"), harmless from and against any and all liabilities, obligations, losses, damages, punitive damages, penalties, fines, claims, actions, suits, costs and expenses (including but not limited to, all reasonable attorneys' fees and costs)

Attachment A

direct or indirect, foreseen or unforeseen, arising from (i) the use of the Property

by Permittee or its representatives (ii) any negligent or willful acts, omissions, or

misconduct of Permittee or its representatives on or about the Property or in

conducting the Work at the Site; (iii) any occurrence or activities on the Property

caused or permitted by Permittee pursuant to this Agreement or in connection with

the Work; or (iv) a violation of the terms of this Agreement, including but not

limited to Paragraph 7, herein, or the FPRA.  The obligations of Permittee under

this Paragraph shall survive the expiration or earlier termination of this Agreement.

The indemnities provided by Permittee in favor of Permittor in this Agreement

shall not require payment as a condition precedent.

13.   Indemnification of Permittee by Permittor.  Permittor shall protect,

indemnify, defend and hold Permittee and its affiliates harmless from and against

any and all liabilities, obligations, losses, damages, punitive damages, penalties,

fines, claims, actions, suits, costs and expenses (including but not limited to, all

reasonable attorneys' fees and costs) direct or indirect, foreseen or unforeseen,

arising from any negligent or intentional act of Permittor or its representative

which directly causes property damage to Permittor's personal property.  It is

specifically understood by the parties that Permittee's indemnification does not

cover environmental contamination at, emanating from, or in the vicinity of the

Property and/or Site as the environmental contamination at, emanating from, or in

Attachment A

the vicinity of the Property and/or Site is specifically why Permittee has been hired pursuant to the FPRA or from Permittee's breach of any provision of this Agreement.

14.   Insurance. Permittee shall perform its Work as an independent contractor, and shall have responsibility for and control over details and means of the performance of the Work. Permittee's single limit liability for damages arising out of the services rendered pursuant to this Agreement, whether arising out of tort or contract, is not less than $1,000,000, with general aggregate for all occurrences within such policy year of not less than said amount, and in each case, such limits to be maintained regardless of any payouts made thereunder and Permittee shall also maintain $9,000,000 excess liability coverage.   Permittee shall maintain commercial general business liability insurance in these amounts. Such policies shall be provided on an "occurrence" basis endorsed to include (i) hazards of operations (including explosion, collapse and underground coverage, independent contractor coverage, broad form property damage liability coverage, products/completed operations coverage and contractual liability coverage) and (ii) name Property Owner as an additional, endorsed and named insured thereunder. Permittee is not liable for any consequential or indirect damages, including but not limited to lost profits, loss of use of property, and Permittor's breach of other contracts.  The Permittee will be responsible only for the activities of its employees

Attachment A

and for Permittee's subcontractors and representatives.  Permittee agrees to carry the required insurance levels and provide Permittor with a Certificate of Insurance naming Permittor as an additional insured on each such policy, and for each subsequent renewal year thereof during the Work, and cause Permittee insurance carriers to provide twenty (20) days advance notice of any nonrenewal, cancellation, or modifications of such policies.

15.    Reservation of Rights.  Permittor hereby reserves any and all rights it may have against Permittee and any other person or entity with respect to the Work at the Property and the Site.   Nothing contained herein shall constitute an admission or acknowledgment of any liability or fault, or proportionate share thereof, for any conditions at the Site, nor shall this Agreement be used as evidence of any admission, acknowledgment, or liability except to enforce or resolve a dispute arising from or related to the terms and conditions of this Agreement. Permittor is entering into this Agreement as part of the settlement agreement and process.

16.    Notices and Data Communications.   Notices and communications shall be distributed and addressed as follows:

<div style="margin-left: 2em;">

To Permittor:          Whitehurst Family Trust
                       c/o John R. Till, Esq.
                       Paladin Law Group® LLP
                       1176 Boulevard Way
                       Walnut Creek, California 94595
                       Telephone:  (925) 947-5700

</div>

Attachment A

17.   <u>Entire Agreement</u>.   This Agreement, related to property access, constitutes the complete and exclusive understanding between the parties and supersedes all oral and written prior or contemporaneous communications, agreement and understanding among the parties to this Agreement relating to Permittee conducting the Work at the Property and the Site, except that this Agreement does not supersede the FPRA or prior access agreements related to the Property.   No alteration, modification, amendment, or waiver of this Agreement shall be valid unless it is in writing and signed by all parties hereto.

18.   <u>Successor and Assigns</u>.   This Agreement shall be binding upon and shall inure to the benefit of the parties to this Agreement and their respective successors and assigns, except that the rights granted herein to Permittee are not assignable without the prior written consent of Permittor, which reserves the right to withhold such consent in its sole and absolute discretion.   Any attempted or purported assignment without such prior written consent shall be null, void, and of no force or effect.   No permitted assignment shall release the assignor from liability arising from the Work or this Agreement.

19.   <u>Execution of Counterparts</u>.   This Agreement may be executed in counterparts, all of which together shall constitute one and the same agreement. The parties agree that this Agreement shall be considered signed when a copy of the last page of this Agreement bearing the signature of a party is delivered to the

Attachment A

other parties by e-mail transmission.  Such e-mail shall be treated in all respects as having the same effect as an original signature.

20.    Attorney's Fees.  Should any litigation commence among the parties concerning the rights and duties arising out of this Agreement, the prevailing party in such litigation shall be entitled, in addition to such other relief as may be granted in the litigation, to a reasonable sum as and for its attorney's fees.

21.    Informing Representatives.    Permittee shall ensure that all of Permittee's representatives who conduct activities pursuant to this Agreement are informed of and comply with provisions of this Agreement.

22.    Termination.  This Agreement shall terminate ninety (90) days after the completion of Work on the Property, including restoration of Property as set forth on Exhibit C, and a NFA letter is received from the Lead Agency.

23.    Relationship of Parties.  Nothing in this Agreement shall at any time be construed as to create a relationship of employer or employee, partnership, principal and agent, or joint venture between Permittor and Permittee.

24.    Headings.  The headings of this Agreement are solely for convenience of reference and should not affect its interpretation.

25.    Applicable Laws.  This Agreement shall be interpreted, and any dispute arising hereunder shall be resolved, in accordance with the substantive

Attachment A

laws of the State of California, including federal, state and local laws, without reference to choice of law rules.

26.   <u>No Waiver or Limitation by Permittor</u>.   Nothing contained in this Agreement shall be construed in any manner to be a waiver or limitation by Permittor of any claim for damages it may have against any person or entity relating to or arising from the conditions at, on, in, under, emanating from, and/or around the Site, or prior operations at the Site by either Permittee, its successors, tenants, assigns, representatives, agents, heirs, trustees, beneficiaries, or any other person.   This Agreement is not and shall not be asserted by any party to this Agreement, third party, or their respective representatives to be a settlement or resolution of any claims, relief, or damages which have or might be asserted or sought in the past or in the future by Permittor against the Permittee, any person, or any entity, or the respective representatives.

27.   <u>Nature of the Agreement.</u>   This Agreement does not convey any estate or interest in the Property to Permittee, to any person, or to any entity.   Permittee agrees, upon request of Permittor, to execute such other and further documents as may be necessary to evidence that except for the license provided in this Agreement, Permittee has no interest or estate in the Property whatsoever.

28.   <u>Remedies Cumulative</u>.   No reference to or exercise of any specific right or remedy by Permittor will prejudice or preclude Permittor from any other

Attachment A

remedy whether allowed at law or in equity or expressly provided for in this Agreement. No such remedy will be exclusive or dependent upon any other such remedy, but Permittor may from time to time exercise any one or more of such remedies independently or in combination.

29.   Compliance With Laws.   Throughout the term of this Agreement, Permittee, its successors, assigns, representatives, agents, heirs, trustees, or beneficiaries shall at all times comply fully with all applicable laws, ordinances, rules, and regulations of any governmental agency having jurisdiction over the Site.

30.   Severability.   If any part, clause, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated; provided, however, in no event shall either party be deprived of a material consideration by operation of this provision.

31.   Warranty of Authorized Signatories.   Permittor warrants and represents that Permittor owns the Property and has authority to enter into this Agreement. Each person signing this Agreement warrants and represents that he or she is competent and authorized to enter into this Agreement on behalf of the party for whom he or she purports to sign.

Attachment A

32.    <u>Agreement to Perform Necessary Acts</u>.  Each party agrees to perform

any further acts and execute and deliver any documents that may be reasonably

necessary to carry out the provisions of this Agreement or the FPRA.  Without

limiting the foregoing, Permittee shall cooperate with Permittor in preparing and

posting a Notice of Non-Responsibility, as attached hereto as Attachment B, in

accordance with California law prior to the commencement of any Work.  This

Notice of Non-Responsibility should be posted on the Property on the first day

Permittee commences Work under this Agreement and shall remain in place until

Work  at  the  Property  and  Site  is  completed.    Permittee  and  Permittor

representatives shall agree upon at least two locations on the Property where the

Notice of Non-Responsibility shall be posted.

33.    <u>Recitals</u>.  The recitals set forth above are deemed an integral part of

this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed as of the date

first set forth above.

PERMITTEE:                                PERMITTOR:

By: _____                    By: _____
Peter Fuller                                   Richard Whitehurst
The Source Group, Inc.

Dated: March ___, 2015              Dated: March 11, 2015

Page **16** of **18**

# ATTACHMENT A

# PROPERTY RESTORATION

Property Restoration – Fixed Cost Agreement
2114 MacArthur Boulevard
Oakland, CA

After the completion of Work on the Property, the Property will be restored as described below:

-Utilities encountered during Work will be capped and available for future connection.

-The ground surface of the footprint of the existing building and areas of excavation will be covered with base rock and compacted.

-Treated soil will be used to backfill the excavation and compacted from the total depth of the excavation to the surface.  Geotechnical compaction tests will be completed in backfilled soils from the ground surface to five feet below ground surface to verify a relative compaction of 90% is achieved.

-SGI will complete spot repairs to asphalt that are damaged during Site Work.

-Groundwater and soil vapor monitoring wells will be properly abandoned and the surface completions will match the surrounding surface.

## ATTACHMENT B

## NOTICE OF NON-RESPONSIBILITY

Notice is hereby given that the undersigned have an interest in that certain real property located at 2114 MacArthur Boulevard, Oakland, California, and previously known as 2114-2116 MacArthur Boulevard, Oakland, California, and with prior APN numbers of 29A-1302-23-4, 29A-1302-24, and 29A-1302-25 and currently APN of 29A-1302-051, Alameda County, California, Records.

The names of the persons giving this notice, who are owners in fee simple, are as follows: Richard G. Whitehurst, as trustee for The Whitehurst Family Trust.

The name of the person or entity causing the work of improvement to be performed is The Source Group, Inc.

All persons please take notice that the undersigned will not be responsible for any work or labor done or materials, supplies or equipment furnished in the construction, alteration or repair of any work of improvement on the above-described property.

Dated: March 11 , 2015

Whitehurst Family Trust
Property Owner

# ATTACHMENT B

# ATTACHMENT C

| | | | Attachment C | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Anticipated Payment Schedule* | | | |
| Quarter-Year | Major Project Task | Total Expected Cost* | Milestone | Month 1 | Month 2 | Month 3 | Notes/Comments |
| Q1/Q2-2015 | Project transition. Submit RAP & HHRA. Remedial design & implementation. | $500,000 | Signed Contract | | | $500,000 | Initial Project funding |
| Q3-2015 | Complete excavation. Quarterly GW & soil gas sampling and reporting. | $466,583 | Complete Demolition of Building and Source Area Treatment Activities (i.e. soil excavation and on-Site EISB injection). | | $500,000 | | |
| Q3-2015 | Complete first EISB injection. Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $175,292 | Complete off-Site EISB injection | $375,000 | | | |
| Q4-2015 | Install indoor air mitigation system. Quarterly GW & gas sampling. Remedial Activity Reporting. | $147,545 | Submittal of Remedial Action Implementation Report | $75,000 | | | |
| Q1-2016 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $22,545 | RWQCB Approval of Remedial Action Implementation Report | $100,000 | | | |
| Q2-2016 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $22,545 | RWQCB Confirmation Property Is Suitable for Redevelopment | $150,000 | | | |
| Q3-2016 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $22,545 | Submit Annual Remedial Performance Monitoring Report 2015 | $40,000 | | | |
| Q4-2016 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $33,187 | | | | | |
| Q1-2017 | Complete second EISB injection. Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $168,187 | Submit Semi-Annual Remedial Performance Monitoring Report 2016 | $50,000 | | | |
| Q2-2017 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $18,187 | | | | | |
| Q3-2017 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $33,187 | Submit Annual Remedial Performance Monitoring Report 2016 | $30,000 | | | |
| Q4-2017 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $18,187 | | | | | |
| Q1-2018 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $18,187 | | | | | |
| Q2-2018 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $18,187 | | | | | |
| Q3-2018 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $18,187 | | | | | |
| Q4-2018 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $14,197 | | | | | |
| Q1-2019 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $14,197 | | | | | |
| Q2-2019 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $14,197 | | | | | |
| Q3-2019 | Quarterly GW & soil gas sampling. Remedial Activity Reporting. | $14,197 | | | | | |
| Q4-2019 | Submit HHRA. GW & soil gas sampling. Remedial Activity Reporting. | $29,197 | | | | | |
| Q1-2020 | Close out site investigation activities. GW & soil gas sampling. Remedial Activity Reporting. | $99,197 | | | | | |
| Q2-2020 | No Further Action Request. GW & soil gas sampling and reporting | $39,717 | Submit Request for No Further Action | $30,000 | | | |
| Q3-2020 | GW & soil gas sampling/reporting. | $39,197 | | | | | |
| Q4-2020 | Well abandonment and project closure. | $87,961 | | | | | |
| Q1-2021 | Project closure. | $5,131 | | | | | |
| Q2-2021 | Project closure. | $5,131 | | | | | |
| Q3-2021 | Project closure. | $5,131 | RWQCB Approves No Further Action Letter and SGI Completes Property Restoration | $200,000 | | | |
| TOTAL | | $2,050,000 | | | | | |

Notes:
RWQCB - Regional Water Quality Control Board
GW - groundwater

* Project tasks will be final billed when milestones are achieved irrespective of work required to complete.

# ATTACHMENT D

**Attachment D**

**SITE ACCESS AGREEMENT**
**2154 MacArthur Blvd.**
**Oakland, California**

This Site Access Agreement ("ACCESS AGREEMENT"), dated March ___, 2015, is made between "The Source Group, Inc." ("CONSULTANT") and Bank of America, N.A. ("PROPERTY OWNER") for access to the DRIVEWAY AREA (defined below) of 2154 MacArthur Blvd., Oakland, California (the "BANK'S PROPERTY") related to the remediation work at 2114 MacArthur Boulevard, Oakland, California (the "SITE"), which SGI is performing under that certain Fixed Price Remediation Agreement, dated March ___, 2015.

1.    Definitions

   a.    "DRIVEWAY AREA" means the driveway on the BANK'S PROPERTY that separates the vacant building on the SITE from the bank building and is normally used by vehicles as an ingress or egress for parking at the BANK'S PROPERTY. The DRIVEWAY AREA's northern boundary extends from the SITE's most north-easterly point to the north-western edge of the bank building. The southern boundary of the DRIVEWAY AREA is MacArthur Blvd. Attachment 1 to the ACCESS AGREEMENT depicts the DRIVEWAY AREA.

   b.    "Environmental Contamination" means Hazardous Substances[1], including without limitations, those substances commonly associated with dry cleaning operations (specifically, perchloroethylene, aka "PCE" or "perc," and its degradation products) in, at, under, in the vicinity of, or emanating from the SITE, which are required by the Regional Water Quality Control Board – San Francisco Bay Region ("RWQCB") to be investigated and remediated.

   c.    "Lead Agency" is defined as the RWQCB and any successor agency which asserts jurisdiction, in lieu of the jurisdiction currently exercised by the RWQCB, over the Environmental Contamination on, at, under, or emanating from the SITE.

   d.    "Project Completion" is defined as when the Lead Agency issues a written statement or statements in the form of a No Further Action ("NFA") letter or letters confirming that:  (i) the subsurface soils of the SITE have been remediated to a level that will allow commercial/industrial uses on ground level of the SITE, in compliance with applicable Hazardous Substances laws and regulations; and (ii) no further or additional investigation,

---

[1]    "Hazardous Substances" means any hazardous waste, solid waste, hazardous material, or hazardous substance as defined in any federal, state or local statute, ordinance, rule, or regulation including without limitation: (i) the substances included within the definition of the term "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601(14), and regulations promulgated thereunder, as amended; (ii) the substances included within the definition of the term "hazardous substances" under the California Hazardous Substance Account Act, California Health and Safety Code § 25300 *et seq.*, and regulations promulgated thereunder, as amended; (iii) any "pollutant or contaminant" under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (iv) any "solid waste" under Section 1004(27) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6903(27); and (v) any "hazardous waste" or "extremely hazardous waste" under 22 California Code of Regulations Section 66600 *et seq.*

SITE ACCESS AGREEMENT:
2154 MacArthur Boulevard,
Oakland, California

remediation, mitigation, or other action is required to address the Environmental Contamination at the SITE for commercial/industrial uses on the ground floor.

   e.      "Remediation" is defined as any activity to actively address Environmental Contamination, or any activity involving removal, disposal, monitoring or sampling, treatment (including *in-situ* treatment) or neutralization of Environmental Contamination in groundwater, soils or soil gas at, on, under or emanating from the SITE.  Remediation includes use of engineering and/or institutional controls, consistent with commercial/industrial use of the SITE.

   f.      "Remediation Agreement" means that certain Fixed Price Remediation Agreement by and between CONSULTANT, PROPERTY OWNER, and Richard G. Whitehurst, as individual and as trustee of the Whitehurst Family Trust ("Whitehurst"), dated February ___, 2015.

   g.      "Work" means all tasks, including without limitation, all administration, drafting, investigation, meetings, negotiation, permitting, planning, public participation, remediation (both active and passive), removal, reporting, sampling, analysis and short- and long-term monitoring, required by the Lead Agency so as to achieve Project Completion under the Remediation Agreement.

2.     Grant of License.

   a.      Subject to the terms and conditions of the ACCESS AGREEMENT, the PROPERTY OWNER hereby grants CONSULTANT (and its authorized contractors, including any subcontractors) a non-exclusive license to enter the DRIVEWAY AREA of the BANK'S PROPERTY without charge for staging of equipment, use of equipment for the demolition of structure(s) on and excavation of the SITE, and other activities as are necessary for Work under the Remediation Agreement during the term of the ACCESS AGREEMENT.

   b.      The PROPERTY OWNER further grants CONSULTANT the right to place a security fence on the DRIVEWAY AREA at its own expense and to leave equipment and materials in the DRIVEWAY AREA during all hours throughout the term of the ACCESS AGREEMENT, at CONSULTANT's sole cost and risk and subject to the conditions of the ACCESS AGREEMENT, including, without limitations, sections 4, 7, and 8 below.

   c.      The ACCESS AGREEMENT does NOT grant CONSULTANT access to any other part of the BANK'S PROPERTY but for the DRIVEWAY AREA.

3.     Valid Title.  PROPERTY OWNER warrants and represents to CONSULTANT that PROPERTY OWNER has the right to grant access to CONSULTANT for the purposes described in section 2 above.

4.     Conditions on Use.

   a.      No demolition or excavation will occur in the DRIVEWAY AREA or in or on any part of the BANK'S PROPERTY.

SITE ACCESS AGREEMENT:
2154 MacArthur Boulevard,
Oakland, California

    b.    No storing, treatment, or disposal of hazardous waste will occur in the DRIVEWAY AREA or in or on any part of the BANK'S PROPERTY.

    c.    If CONSULTANT constructs any monitoring wells in the DRIVEWAY AREA, CONSULTANT shall do so such that the top of each well is located at grade and is able to withstand, and not interfere with, pedestrian, automobile and truck traffic.  CONSULTANT shall design, construct, install, use, maintain, repair and modify any monitoring well, boring and other equipment and facilities utilized by CONSULTANT in the DRIVEWAY AREA to minimize, to the extent practicable, the occurrence and magnitude of any spills or leaks of fluids, and shall maintain such wells and facilities in good working condition.

    d.    CONSULTANT shall be responsible for any damage to personal property or improvements in the DRIVEWAY AREA caused by CONSULTANT's activities.

5.    <u>Indemnification of PROPERTY OWNER by CONSULTANT</u>.  CONSULTANT shall protect, indemnify, defend and hold PROPERTY OWNER and its affiliates, as well as the holder of any mortgage, deed of trust or other security interest encumbering the BANK'S PROPERTY, or any interest therein, and the officers, directors, agents, partners, employees, and tenants of each of them, and their respective heirs, successors and assigns harmless from and against any and all liabilities, obligations, losses, damages, punitive damages, penalties, fines, claims, actions, suits, costs and expenses (including but not limited to, all reasonable attorneys' fees and costs) direct or indirect, foreseen or unforeseen, arising from:  (i) the use of the BANK'S PROPERTY by CONSULTANT or its representatives; (ii) any negligent or willful acts, omissions, or misconduct of CONSULTANT or its representatives on or about the BANK'S PROPERTY or in conducting the Work on the BANK'S PROPERTY; (iii) any occurrence or activities on the BANK'S PROPERTY caused or permitted by CONSULTANT pursuant to the ACCESS AGREEMENT or in connection with the Work; or (iv) a violation of the terms of the ACCESS AGREEMENT or the Remediation Agreement.  The obligations of CONSULTANT under this Paragraph shall survive the expiration or earlier termination of the ACCESS AGREEMENT.  The indemnities provided by CONSULTANT in favor of PROPERTY OWNER in the ACCESS AGREEMENT shall not require payment as a condition precedent.

6.    <u>Insurance</u>.  CONSULTANT shall perform its Work as an independent contractor, and shall have responsibility for and control over details and means of the performance of the Work.  CONSULTANT's single limit liability for damages arising out of the services rendered pursuant to the ACCESS AGREEMENT, whether arising out of tort or contract, is not less than $1,000,000, with general aggregate for all occurrences within such policy year of not less than said amount, and in each case, such limits to be maintained regardless of any payouts made thereunder and CONSULTANT shall also maintain $9,000,000 excess liability coverage.  CONSULTANT shall maintain commercial general business liability insurance in these amounts.  Such policies shall be provided on an "occurrence" basis endorsed to include (i) hazards of operations (including explosion, collapse and underground coverage, independent contractor coverage, broad form property damage liability coverage, products/completed operations coverage and contractual liability coverage) and (ii) name PROPERTY OWNER as an additional, endorsed and named insured thereunder.  CONSULTANT is not liable for any

SITE ACCESS AGREEMENT:
2154 MacArthur Boulevard,
Oakland, California

consequential or indirect damages, including but not limited to lost profits, loss of use of property, and PROPERTY OWNER's breach of other contracts. The CONSULTANT will be responsible only for the activities of its employees and for CONSULTANT's subcontractors and representatives. CONSULTANT agrees to carry the required insurance levels and provide PROPERTY OWNER with a Certificate of Insurance naming PROPERTY OWNER as an additional insured on each such policy, and for each subsequent renewal year thereof during the Work, and cause CONSULTANT insurance carriers to provide twenty (20) days advance notice of any nonrenewal, cancellation, or modifications of such policies.

7.    Removal of CONSULTANT'S Equipment and Materials. All tools, equipment, or other personal property, except as designed to be installed pursuant to the Work, shall be removed from the DRIVEWAY AREA within ten (10) business days after completion of the demolition at and the excavation of the SITE. CONSULTANT or its representatives shall assume all expenses, liabilities, and risks associated with any and all tools, personal property, equipment, or other items associated with the Work in the DRIVEWAY AREA and at the SITE. In the event that CONSULTANT desires to retain overnight security personnel, at its sole cost, to ensure the safety of items left in the DRIVEWAY AREA, said security personnel will be allowed in the DRIVEWAY AREA, but such permission does not extend to other areas of the BANK'S PROPERTY.

8.    Restoration of the DRIVEWAY AREA. If CONSULTANT or its representatives cause damage to the DRIVEWAY AREA, CONSULTANT shall reasonably restore the DRIVEWAY AREA to its condition existing immediately prior to the occurrence of such damage. CONSULTANT shall complete all repair and restoration work in a good and workmanlike manner with reasonable diligence, in compliance with all applicable laws and regulations.

9.    Condition of Property. CONSULTANT acknowledges that PROPERTY OWNER has made no representations or warranties concerning the DRIVEWAY AREA, including without limitation the area's environmental or seismological condition. CONSULTANT accepts the condition of the DRIVEWAY AREA "AS IS." CONSULTANT shall maintain the DRIVEWAY AREA so it will not be unsafe, unsightly or unsanitary as a result of the Work. If PROPERTY OWNER obtains actual knowledge of new or additional conditions arising during the term of the ACCESS AGREEMENT that would cause the DRIVEWAY AREA to be unsafe for CONSULTANT'S activities under the ACCESS AGREEMENT, PROPERTY OWNER shall notify CONSULTANT of such conditions.

10.    Utilities. PROPERTY OWNER will provide CONSULTANT with information in its possession with respect to any utilities or subsurface structures that may be located in or on the DRIVEWAY AREA prior to the Work. CONSULTANT has the ultimate responsibility to locate the same and protect the same from damage. CONSULTANT shall be solely responsible for any damage to utilities resulting from CONSULTANT'S activities.

11.    No Nuisance. Except for the performance of the Work, CONSULTANT shall not conduct any activities in, at, on, under, or about the DRIVEWAY AREA that constitutes nuisance or unreasonable annoyance (including without limitation emission of objectionable

SITE ACCESS AGREEMENT:
2154 MacArthur Boulevard,
Oakland, California

odors, noises, or lights) to the PROPERTY OWNER, the owners or occupants of neighboring property, or to the public, or that constitutes waste or nuisance per se.

12.     Liens.  CONSULTANT shall keep the BANK'S PROPERTY free and clear of all mechanic's, materialmen's and other liens resulting from the performance of the Work. CONSULTANT shall indemnify, defend, and hold harmless PROPERTY OWNER from and against any and all liens and any and all costs associated with such liens.

13.     Term.  The term of the ACCESS AGREEMENT shall commence on the date of its execution and shall continue thereafter until CONSULTANT has completed demolition at and excavation of the SITE, or until June 30, 2015, whichever is sooner; provided, however, that with mutual consent of both PROPERTY OWNER and CONSULTANT the term may be extended as necessary to accommodate delays or additional work.  CONSULTANT shall use commercially reasonable efforts to complete the demolition and excavation work on the SITE as soon as possible.

CONSULTANT

The Source Group, Inc.
3478 Buskirk Avenue
Suite 100
Pleasant Hill, CA 94523

By: _____

Signature: _____

Date:  March ___, 2015

PROPERTY OWNER

Bank of America, N.A.
214 N. Tryon Street,
NC1-027-20-05
Charlotte, NC 28255

By: JOSEPH RYAN, SVP/PROP. DIR

Signature: _____

Date:  March __, 2015

**EXHIBIT 2**

**Recording Requested By:**

[CURRENT OWNER]

**When Recorded, Mail To:**
Bruce H. Wolfe, Executive Officer
California Regional Water Quality Control Board
San Francisco Bay Region
1515 Clay Street, Suite 1400
Oakland, California 94612

## COVENANT AND ENVIRONMENTAL RESTRICTION
## ON PROPERTY

### [NAME OF SITE and ADDRESS OF PROPERTY]

    This Covenant and Environmental Restriction on Property (this "Covenant") is made as of the ____ day of _____, 20__ by Richard G. Whitehurst and Lorraine D. Whitehurst, as individuals and as trustees of the Whitehurst Family Trust, ("Covenantor") who is the Owner of record of that certain property situated at 2114 MacArthur Boulevard, in the City of Oakland, County of Alameda, State of California, which is more particularly described in Exhibit A attached hereto and incorporated herein by this reference (such portion hereinafter referred to as the "Burdened Property"), for the benefit of the California Regional Water Quality Control Board for the San Francisco Bay Region (the "Board"), with reference to the following facts:

    A.  The Burdened Property and groundwater underlying the property may contains hazardous materials.

    B.  Contamination of the Burdened Property.  Soil at the Burdened Property was contaminated by former dry cleaning operations. These operations resulted in contamination of soil, soil vapor, and groundwater with volatile organic chemicals, primarily perchloroethylene (PCE) and less-chlorinated chemicals trichloroethylene (TCE), dichloroethylene (DCE), and vinyl chloride (VC), which constitute hazardous materials as that term is defined in Health & Safety Code Section 25260.  Remedial actions including source area soil excavation and treatment, and enhanced in-situ bioremediation of groundwater have been conducted at the site. On-site vapor mitigation measures including vapor barriers and passive/active sub-building slab venting have been or may be implemented, if necessary.

    C.  Exposure Pathways.  The contaminants addressed in this Covenant are present or may be in soil, soil vapor, and groundwater on the Burdened Property.  Without the mitigation measures and administrative controls which have been performed on the Burdened Property, exposure to these contaminants could take place via dermal contact by construction workers, vapor intrusion, or direct ingestion of groundwater.  The risk of public exposure to the contaminants has been substantially lessened by the remediation and controls described herein.

D. <u>Adjacent Land Uses and Population Potentially Affected</u>. The Burdened Property is used for commercial land uses and is adjacent to commercial land uses.

E.  Full and voluntary disclosure to the Board of the presence of hazardous materials on the Burdened Property has been made and extensive sampling of the Burdened Property and surrounding area has been conducted.

F.  Covenantor desires and intends that in order to benefit the Board, and to protect the present and future public health and safety, the Burdened Property shall be used in such a manner as to avoid potential harm to persons or property that may result from hazardous materials that may have been deposited on portions of the Burdened Property.

ARTICLE I
GENERAL PROVISIONS

1.1 <u>Provisions to Run with the Land</u>.  This Covenant sets forth protective provisions, covenants, conditions and restrictions (collectively referred to as "Restrictions") upon and subject to which the Burdened Property and every portion thereof shall be improved, held, used, occupied, leased, sold, hypothecated, encumbered, and/or conveyed.  The restrictions set forth in Article III are reasonably necessary to protect present and future human health and safety or the environment as a result of the presence on the land of hazardous materials.  Each and all of the Restrictions shall run with the land, and pass with each and every portion of the Burdened Property, and shall apply to, inure to the benefit of, and bind the respective successors in interest thereof, for the benefit of the Board and all Owners and Occupants.  Each and all of the Restrictions are imposed upon the entire Burdened Property unless expressly stated as applicable to a specific portion of the Burdened Property.  Each and all of the Restrictions run with the land pursuant to section 1471 of the Civil Code.  Each and all of the Restrictions are enforceable by the Board.

1.2 <u>Concurrence of Owners and Lessees Presumed</u>.  All purchasers, lessees, or possessors of any portion of the Burdened Property shall be deemed by their purchase, leasing, or possession of such Burdened Property, to be in accord with the foregoing and to agree for and among themselves, their heirs, successors, and assignees, and the agents, employees, and lessees of such owners, heirs, successors, and assignees, that the Restrictions as herein established must be adhered to for the benefit of the Board and the Owners and Occupants of the Burdened Property and that the interest of the Owners and Occupants of the Burdened Property shall be subject to the Restrictions contained herein.

1.3 <u>Incorporation into Deeds and Leases</u>. Covenantor desires and covenants that the Restrictions set out herein shall be incorporated in and attached to each and all deeds and leases of any portion of the Burdened Property.  Recordation of this Covenant shall be deemed binding on all successors, assigns, and lessees, regardless of whether a copy of this Covenant and Agreement has been attached to or incorporated into any given deed or lease.

1.4 <u>Purpose</u>.  It is the purpose of this instrument to convey to the Board real property rights,

2

which will run with the land, to facilitate the remediation of past environmental contamination and to protect human health and the environment by reducing the risk of exposure to residual hazardous materials.

## ARTICLE II
## DEFINITIONS

2.1 Board. "Board" shall mean the California Regional Water Quality Control Board for the San Francisco Bay Region and shall include its successor agencies, if any.

2.2 Improvements. "Improvements" shall mean all buildings, roads, driveways, regradings, and paved parking areas, constructed or placed upon any portion of the Burdened Property.

2.3 Occupants. "Occupants" shall mean Owners and those persons entitled by ownership, leasehold, or other legal relationship to the exclusive right to use and/or occupy all or any portion of the Burdened Property.

2.4 Owner or Owners. "Owner" or "Owners" shall mean the Covenantor and/or its successors in interest, who hold title to all or any portion of the Burdened Property.

## ARTICLE III
## DEVELOPMENT, USE AND CONVEYANCE OF THE BURDENED PROPERTY

3.1 Restrictions on Development and Use. Covenantor promises to restrict the use of the Burdened Property as follows:

a.  No Owners or Occupants of the Property or any portion thereof shall conduct any excavation work on the Property, unless conducted according to the Site Soil Management Plan ("SMP"). Any contaminated soils brought to the surface by grading, excavation, trenching, or backfilling shall be managed by Covenantor or his agent in accordance with the SMP and all applicable provisions of local, state and federal law;

b.  All uses and development of the Burdened Property shall be consistent with the Site Risk Management Plan ("RMP"), which is hereby incorporated by reference including future amendments thereto. All uses and development shall provide for construction and maintenance of vapor intrusion mitigation measures pursuant to the requirements of the Board, unless otherwise expressly permitted in writing by the Board.

h.  No Owners or Occupants of the Property or any portion thereof shall drill, bore, otherwise construct, or use a well for the purpose of extracting water for any use, including but not limited to, domestic, potable, or industrial uses, unless expressly permitted in writing by the Board.

i.  The Owner shall notify the Board of each of the following: (1) The type, cause, location and date of any disturbance to vapor mitigation systems which could affect the ability of such

3

mitigation measures to perform their respective functions and (2) the type and date of repair of such disturbance. Notification to the Board shall be made by registered mail within ten (10) working days of both the discovery of such disturbance and the completion of repairs;

j.   The Covenantor agrees that the Board, and/or any persons acting pursuant to Board orders, shall have reasonable access to the Burdened Property for the purposes of inspection, surveillance, maintenance, or monitoring, as provided for in Division 7 of the Water Code.

k.   No Owner or Occupant of the Burdened Property shall act in any manner that will aggravate or contribute to the existing environmental conditions of the Burdened Property.

3.2 <u>Enforcement</u>.  Failure of an Owner or Occupant to comply with any of the restrictions, as set forth in paragraph 3.1, shall be grounds for the Board, by reason of this Covenant, to have the authority to require that the Owner modify or remove any Improvements constructed in violation of that paragraph.  Violation of the Covenant shall be grounds for the Board to file civil actions against the Owner as provided by law.

3.3 <u>Notice in Agreements</u>.  After the date of recordation hereof, all Owners and Occupants shall execute a written instrument which shall accompany all purchase agreements or leases relating to the property. Any such instrument shall contain the following statement:

> The land described herein contains hazardous materials in soils, soil vapor, and in the ground water under the property, and is subject to a deed restriction dated as of _____, 199_, and recorded on _____, 199_, in the Official Records of _____ County, California, as Document No. _____, which Covenant and Restriction imposes certain covenants, conditions, and restrictions on usage of the property described herein.  This statement is not a declaration that a hazard exists.

## ARTICLE IV
## VARIANCE AND TERMINATION

4.1 <u>Variance</u>.  Any Owner or, with the Owner's consent, any Occupant of the Burdened Property or any portion thereof may apply to the Board for a written variance from the provisions of this Covenant.

4.2 <u>Termination</u>.  Any Owner or, with the Owner's consent, any Occupant of the Burdened Property or a portion thereof may apply to the Board for a termination of the Restrictions as they apply to all or any portion of the Burdened Property.

4.3 <u>Term</u>.  Unless terminated in accordance with paragraph 4.2 above, by law or otherwise, this Covenant shall continue in effect in perpetuity.

4

ARTICLE V
MISCELLANEOUS

5.1 <u>No Dedication Intended</u>. Nothing set forth herein shall be construed to be a gift or dedication, or offer of a gift or dedication, of the Burdened Property or any portion thereof to the general public.

5.2 <u>Notices</u>. Whenever any person gives or serves any notice, demand, or other communication with respect to this Covenant, each such notice, demand, or other communication shall be in writing and shall be deemed effective (1) when delivered, if personally delivered to the person being served or official of a government agency being served, or (2) three (3) business days after deposit in the mail if mailed by United States mail, postage paid certified, return receipt requested:

*If To*: "Covenantor"
[Owners name and address]

*If To*: "Board"
Regional Water Quality Control Board
San Francisco Bay Region
Attention: Executive Officer
1515 Clay Street, Suite 1400
Oakland, California 94612

5.3 <u>Partial Invalidity</u>. If any portion of the Restrictions or terms set forth herein is determined to be invalid for any reason, the remaining portion shall remain in full force and effect as if such portion had not been included herein.

5.4 <u>Article Headings</u>. Headings at the beginning of each numbered article of this Covenant are solely for the convenience of the parties and are not a part of the Covenant.

5.5 <u>Recordation</u>. This instrument shall be executed by the Covenantor and by the Executive Officer of the Board. This instrument shall be recorded by the Covenantor in the County of _____ within ten (10) days of the date of execution.

5.6 <u>References</u>. All references to Code sections include successor provisions.

5.7 <u>Construction</u>. Any general rule of construction to the contrary notwithstanding, this instrument shall be liberally construed in favor of the Covenant to effect the purpose of this instrument and the policy and purpose of the Water Code. If any provision of this instrument is found to be ambiguous, an interpretation consistent with the purpose of this instrument that would render the provision valid shall be favored over any interpretation that would render it invalid.

IN WITNESS WHEREOF, the parties execute this Covenant as of the date set forth above.

5

Covenantor: _____

By: _____
Title: _____
Date: _____


Agency:                          State of California
                                 Regional Water Quality Board,
                                 San Francisco Bay Region


By: _____

Title: __Executive Officer_____
Date: _____

DOCSSV1-55004.1/exhibit 2 to settlement agreement (exemplar deed restrictions)

STATE OF CALIFORNIA        )
                           )
COUNTY OF _____    )


On _____, 20__ before me, the undersigned a Notary Public in and for said state, personally appeared [Covenantor], personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument.


WITNESS my hand and official seal.


_____
Notary Public in and for said
County and State


STATE OF CALIFORNIA        )
                           )
COUNTY OF _____    )


On _____, 20__ before me, the undersigned a Notary Public in and for said state, personally appeared [EXECUTIVE OFFICER], personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument.


WITNESS my hand and official seal.


_____
Notary Public in and for said
County and State

DOCSSV1-55004.1/exhibit 2 to settlement agreement (exemplar deed restrictions)

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

DOCSSV1-55004.1/exhibit 2 to settlement agreement (exemplar deed restrictions)

# EXHIBIT 3

## Exhibit 3

## Heinl's Participating / Exhausted Insurance Coverage

| Policy # | Policy Period | Limits of Liability | Underwriting Co. |
|---|---|---|---|
| CAL 207-904073 | 10/10/1977 – 10/10/1978 | $300,000 per occurrence/aggregate | Chicago Insurance Company |
| CAL 207-905659 | 11/30/1978 – Cancelled effective 12/27/1978 | $300,000 per occurrence/aggregate | Chicago Insurance Company |

Exhibit B

## FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

This First Amendment to Settlement Agreement and Release (hereinafter referred to as the "First Amendment"), as of the Effective Date, is entered into by and between: (a) Richard G. Whitehurst and Lorraine D. Whitehurst, as individuals and as trustees of the Whitehurst Family Trust (collectively hereinafter "Whitehurst"); (b) Chicago Insurance Company, one of the Fireman's Fund Insurance Companies, on behalf of its insured, Charlotte A. Heinl, deceased, an individual and dba Norge Cleaners (collectively hereinafter "Fireman's Fund"); and (c) Bank of America, N.A. (hereinafter the "Bank"). Whitehurst, Charlotte Heinl ("Heinl"), deceased, and the Bank shall collectively be referred to as "the Parties" and each of them a "Party" to this First Amendment.

## RECITALS

**WHEREAS:**

A.     The Parties executed the Settlement Agreement and Waiver and Release (the "Settlement Agreement") with an effective date of March 23, 2015;

B.     Exhibit 1 to the Settlement Agreement is an exemplar of a fixed price remediation agreement ("Remediation Agreement") with a to-be-named environmental consulting firm who the Parties plan to retain to perform the remediation work contemplated in the Settlement Agreement;

C.     The Source Group, Inc. ("SGI"), an environmental consulting firm that the Parties have chosen to perform work pursuant to the Remediation Agreement, requires a modification to the definition of "Environmental Contamination" (in section 1.B) and a clarification to the payment structure (in section 3.E.) of the Remediation Agreement before executing the Remediation Agreement; and

D.     The Parties desire to modify the definition of "Environmental Contamination" and clarify the payment structure in the Remediation Agreement so that it can be executed, but also recognize that related clarifications need to be made to the Settlement Agreement so that the Remediation Agreement and Settlement Agreement are consistent.

US_ACTIVE-121562666.2

CONFIDENTIAL FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

## TERMS

NOW, THEREFORE, in consideration of the terms, conditions, and promises set forth herein, the Parties agree as follows:

1.      Section 4(G) of the Settlement Agreement is AMENDED to read as follows:

> The purpose of the Remediation Project is to obtain a No Further Action determination from the Regulatory Agency with primary jurisdiction over the Remediation Project, stating that:   (i) the Remediation Project has remediated the subsurface soils of the Site with respect to Environmental Contamination relating to dry cleaning chemicals (including without limitation PCE and its daughter compounds and any compounds formed as a byproduct of dry cleaning chemical remediation) to a commercial/industry standard pursuant to applicable Hazardous Substances laws and regulations and (ii) no further or additional investigation, remediation, mitigation, monitoring, or other action is required to address the Environmental Contamination relating to dry cleaning chemicals (including without limitation PCE and its daughter compounds and any compounds formed as a byproduct of dry cleaning chemical remediation).

2.      Section 4(F) is AMENDED to read as follows:

> If there are any residual funds ("Residual Funds") in the Remediation Escrow Account one hundred eighty (180) days after issuance of the Final NFA letter by the Regional Water Quality Control Board and after full payment of $2.05 million dollars for the Remediation Project has been made to Consultant, seventy five percent (75%) of the Residual Funds shall be distributed to the Bank, with the remaining twenty five percent (25%) distributed:

With subparts (i) and (ii) of section 4(F) remaining unmodified.

CONFIDENTIAL FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

3.      All other provisions in the Settlement Agreement are *not* modified in any way and remain in full force and effect to the extent called for in the Settlement Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By:_____
Richard Whitehurst, individually and as trustee
for the Whitehurst Family Trust.
Date: April ___, 2015


By:_____
Lorraine Whitehurst, individually and as
trustee for the Whitehurst Family Trust.
Date: April ___, 2015

**The Bank:**

Bank of America, NA

By:_____
Joe Ryan
Senior Vice President
Regional Property Director
Date: April ___, 2015

**Fireman's Fund:**

By:_____
Chicago Insurance Company, one of the
Fireman's Fund Insurance Companies, on
behalf of its insured, Charlotte Heinl, deceased
Date: April ___, 2015

Approved as to form by:

**Paladin Law Group® LLP**

By:_____
John R. Till
Attorney for Whitehurst
Date: April ___, 2015

Approved as to form by:

**Wood, Smith, Henning & Berman LLP**

By:_____
David F. Wood
Attorney for Heinl
Date: April 21, 2015

Approved as to form by:

**Reed Smith LLP**

By:_____
Todd O. Maiden
Attorney for Bank of America, NA
Date: April ___, 2015

Page 3 of 3

CONFIDENTIAL FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

3.     All other provisions in the Settlement Agreement are *not* modified in any way and remain in full force and effect to the extent called for in the Settlement Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By:_____
Richard Whitehurst, individually and as trustee
for the Whitehurst Family Trust.
Date:  April ___, 2015

By:_____
Lorraine Whitehurst, individually and as
trustee for the Whitehurst Family Trust.
Date:  April ___, 2015

Approved as to form by:

**Paladin Law Group® LLP**

By:_____
John R. Till
Attorney for Whitehurst
Date:  April ___, 2015

Approved as to form by:

**Wood, Smith, Henning & Berman LLP**

By:_____
David F. Wood
Attorney for Heinl
Date:  April ___, 2015

**The Bank:**

Bank of America, NA

By:_____
Joe Ryan
Senior Vice President
Regional Property Director
Date:  April ___, 2015

**Fireman's Fund:**       *Scott W. Osmus*

By:_____
Chicago Insurance Company, one of the
Fireman's Fund Insurance Companies, on
behalf of its insured, Charlotte Heinl, deceased
Date:  April _21_, 2015

Approved as to form by:

**Reed Smith LLP**

By:_____
Todd O. Maiden
Attorney for Bank of America, NA
Date:  April ___, 2015

CONFIDENTIAL FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

3.      All other provisions in the Settlement Agreement are *not* modified in any way and remain in full force and effect to the extent called for in the Settlement Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By:_____
Richard Whitehurst, individually and as trustee for the Whitehurst Family Trust.
Date: April ___, 2015

By:_____
Lorraine Whitehurst, individually and as trustee for the Whitehurst Family Trust.
Date: April ___, 2015

**The Bank:**

Bank of America, NA

By:_____
Joe Ryan
Senior Vice President
Regional Property Director
Date: April 21, 2015

**Fireman's Fund:**

By:_____
Chicago Insurance Company, one of the Fireman's Fund Insurance Companies, on behalf of its insured, Charlotte Heinl, deceased
Date: April ___, 2015

Approved as to form by:

**Paladin Law Group® LLP**

By:_____
John R. Till
Attorney for Whitehurst
Date: April ___, 2015

Approved as to form by:

**Wood, Smith, Henning & Berman LLP**

By:_____
David F. Wood
Attorney for Heinl
Date: April ___, 2015

Approved as to form by:

**Reed Smith LLP**

By:_____
Todd O. Maiden
Attorney for Bank of America, NA
Date: April 21, 2015

Page 3 of 3

CONFIDENTIAL FIRST AMENDMENT TO SETTLEMENT AGREEMENT AND RELEASE

3.      All other provisions in the Settlement Agreement are *not* modified in any way and remain in full force and effect to the extent called for in the Settlement Agreement.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates below.

THE UNDERSIGNED PARTIES ENTER INTO THIS AGREEMENT:

**Whitehurst:**

By: _____
Richard Whitehurst, individually and as trustee
for the Whitehurst Family Trust.
Date: April 22 , 2015

By: _____
Lorraine Whitehurst, individually and as
trustee for the Whitehurst Family Trust.
Date: April 22, 2015

Approved as to form by:

**Paladin Law Group® LLP**

By: _____
John R. Till
Attorney for Whitehurst
Date: April 22, 2015

Approved as to form by:

**Wood, Smith, Henning & Berman LLP**

By: _____
David F. Wood
Attorney for Heinl
Date: April 21 , 2015

**The Bank:**

Bank of America, NA

By: _____
Joe Ryan
Senior Vice President
Regional Property Director
Date:  April ___, 2015

**Fireman's Fund:**

By: _____
Chicago Insurance Company, one of the
Fireman's Fund Insurance Companies, on
behalf of its insured, Charlotte Heinl, deceased
Date: April ___, 2015

Approved as to form by:

**Reed Smith LLP**

By: _____
Todd O. Maiden
Attorney for Bank of America, NA
Date: April ___, 2015

Page 3 of 3